Ronnie Paul **THREADGILL**, Appellant,

v.

The **STATE** of Texas.

No. 74458.

Court of Criminal Appeals of Texas, En Banc.

Oct. 13, 2004.

Damara H. Watkins and Robert C. Dunn, Corsicana, for Appellant.

James Lagomarsino, Asst. District Atty., Corsicana, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MEYERS, J., delivered the opinion of the Court, in which KELLER, P.J., and WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., join.

Appellant was convicted in July, 2002 of capital murder. TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises twenty-two points of error. We affirm.

In his first point of error, appellant claims that the trial court erred in denying his motion to suppress blood evidence taken from his clothing.[2] Following the shooting of a passenger in a car stolen by appellant, appellant was arrested and charged with unauthorized use of a motor vehicle and a parole violation. Pursuant to standard Navarro County jail procedures,

appellant was given a jail uniform, and his clothes and personal effects were inventoried and placed into paper bags to prevent contamination. The clothes were forwarded to a Department of Public Safety (DPS) laboratory for DNA analysis because officers believed there might be blood on them.[3] Analysis revealed that the blood on appellant's clothes matched the blood of the victim. Appellant moved to suppress the evidence on the ground that the clothes should not have been tested without a warrant. The trial court denied appellant's motion, ruling the search incident to a valid arrest. Appellant argues that the DNA analysis of the blood on his clothes was an invalid search because it was conducted without a search warrant.

In *Oles v. State*, 993 S.W.2d 103 (Tex. Crim.App.1999), we granted the appellant's petition for discretionary review to decide whether "law enforcement, without a search warrant, may test the clothing of a person lawfully arrested and in custody for one offense in order to investigate that person's involvement in another (a second) offense, when there are no exigent circumstances to justify the warrantless testing, nor is there probable cause to test the clothing for the second offense." *Id.* at 104–05. We concluded that police may examine and test clothing validly within

1. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

2. On appeal, appellant claims that his rights were violated under the Fourth Amendment to the United States Constitution, Article I § 9 of the Texas Constitution, and Article 38.23. At trial, appellant did not cite or refer to any particular law he claimed was violated, either orally or in his written motion. In ruling the search valid as incident to arrest, the trial court applied general Fourth Amendment law. Because appellant did not ask the trial court to make a ruling on the basis of any other law, appellant's claim on appeal is

therefore limited to the context of the Fourth Amendment. TEX.R.APP. P. 33.1. Appellant also argues the search was not justified as incident to arrest because the State produced no evidence that he was lawfully arrested, but he failed to make this argument at trial. TEX. R.APP. P. 33.1.

3. The officer who sent the clothes to the DPS lab testified that he was told there was blood on them by another officer. Although the other officer testified that he could not recall apparent blood or stains on the clothing, the clothing was handled in a manner consistent with evidence requiring laboratory analysis.

their control and custody, regardless of the existence of probable cause or exigent circumstances. *Id.* at 109. We further stated that "once it is determined that police lawfully seized the personal effects of an arrestee, his expectation of privacy is diminished in those effects until he *can* and *does* exhibit subjective expectations through his conduct, presumably at the time of release from detainment or incarceration." *Id.* at 110 (emphasis in original). In the absence of any evidence that the appellant harbored a subjective expectation of privacy in his clothing that was in police custody or any evidence that society would deem such belief reasonable, we held that the appellant's clothing did not fall under the protection of the Fourth Amendment and therefore the warrantless search was valid and reasonable. *Id.* at 110–11.

Appellant points to no evidence that he possessed a subjective expectation of privacy in his clothing that was in police custody. Since there was no reasonable expectation of privacy and the search of the clothing was not unreasonable under the circumstances, the trial court did not abuse its discretion by denying appellant's motion to suppress the DNA results. *Id.* Point of error one is overruled.

In his second point of error, appellant claims that the evidence is legally insufficient to support his conviction. He claims that the evidence is insufficient in three respects. He claims it does not support the findings that he was the offender, that he had intent to kill the victim, or that the murder occurred in the course of robbing the victim.

On the evening of April 14, 2001, a birthday party was held at the Pleasure Garden Club in Navarro County for Christopher Lane and his sister, Mona Lane. The party ended sometime between 2:00 and 4:00 a.m. Dexter McDonald and Kevin Williams planned to ride home with Christopher. Williams got in the front passenger seat of Christopher's car and McDonald got in the back. Christopher was driving. Before leaving Pleasure Garden, Christopher got out of the car to talk to someone and left the car running with the driver's side door open. Christopher testified he left Williams and McDonald in possession of his vehicle. Christopher then heard gunshots and saw his car being driven out of the parking lot. The car stopped at the stop sign at the access road and then headed north on Interstate 45 toward Dallas. Williams had jumped out of the car before it left the Pleasure Garden parking lot, but the driver pulled McDonald from the car and left him on the ground when the car stopped at the stop sign. Friends took McDonald to the hospital where he died of a gunshot wound to the chest.

Danyel Dwayne Nellums attended the birthday party and was in the parking lot afterwards. He was walking toward Christopher's car when he saw a man run from behind the car and jump into the driver's seat. According to Nellums, the man fired a shot and Williams jumped out. The man fired a second shot, which struck McDonald, and drove off. The man was wearing blue jeans and a white T-shirt. He had a bandana over the lower part of his face and was carrying a black pistol. Although Nellums stated that he was not able to identify the shooter in a lineup because of the bandana, he nonetheless testified that he recognized the shooter as a person he saw earlier in the night sitting in an old car parked next to Christopher's car in the Pleasure Garden parking lot.[4]

4. It is worth noting that it was not made clear on direct- or cross-examination of Nellums, or through any other witness, whether or not

Nellums identified appellant in the courtroom as the person he saw that night, stating that he was "positive" it was him.

Mona Lane testified that she did not see the shooter's face, but saw him from the back. He was wearing blue jeans, a white T-shirt, and dark shoes. She testified that a car she had seen parked in the club's parking lot earlier in the night pulled up beside her brother's car, and the driver jumped out and ran around Christopher's car, yelling to the passengers to get out. Then she heard gunshots. She testified that she had seen the shooter earlier in the night sitting in the driver's seat of a car outside of the club. She identified appellant as the man she saw earlier in the night sitting in the driver's seat of a car in the parking lot.

The incident was immediately reported to police, and a dispatch went out for the stolen vehicle. Officers with the Ennis Police Department heard the dispatch and saw a vehicle matching the given description traveling on I–45. The officers pursued the vehicle with their sirens on and lights flashing. The vehicle exited the freeway and attempted to turn the wrong way onto the one-way service road. The driver slammed on the brakes and skidded into a ditch, disabling the vehicle. The driver got out of the vehicle and ran to a nearby Mobil Station where a number of semi-trucks were parked. The officers surrounded the station, and found Appellant hanging from the axle underneath a semi-truck trailer. A bandana was found stuffed under the frame of the trailer where he was hiding. He was wearing blue jeans and a white T-shirt. Ennis police officer Randy Owen identified appellant as the person he saw get out of Christopher's vehicle and the person who was found hiding under the truck. Appellant's fingerprints were matched to fingerprints

lifted from the rear passenger door of Christopher's vehicle. The blood of the victim matched blood on appellant's clothes.

Appellant called Kevin Williams, the passenger who escaped from the front seat of the car before it left the Pleasure Garden parking lot. Williams testified that he did not get a good look at the shooter because of the scarf obscuring his face from the middle of his nose down. However, he testified that he believed the skin color of the shooter was a little lighter than appellant's. When questioned further by appellant's counsel, he stated that he was positive the shooter was lighter than appellant. When questioned by the prosecutor, however, Williams agreed that he was not saying that appellant was not the shooter, that he could have been. On re-direct Williams reiterated that he was positive the person who got in the car was a lighter skin color than appellant. Again, on re-cross Williams agreed that he was not saying the shooter was not appellant and he agreed that it could have been.

### Identity

■ Appellant concedes that the evidence is sufficient to show he was at the scene prior to the shooting and that he later obtained the stolen car, but claims the evidence is legally insufficient to show that he was the shooter. He argues that the DNA and fingerprint evidence shows only that he might have been in the car when the shootings occurred but does not establish that he was the shooter. He hypothesizes that the shooter could have abandoned the car after leaving Pleasure Garden but before the pursuit by the Ennis Police, and appellant could have obtained it at that point.

appellant's photo was even included among those shown to Nellums in the photo lineup.

■ In assessing the legal sufficiency of the evidence, the reviewing court considers all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The *Jackson* standard of review "gives full play to the jury's responsibility fairly to resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from the evidence." *Garcia v. State*, 57 S.W.3d 436, 441 (Tex.Crim.App.2001), *cert. denied*, 537 U.S. 1195, 123 S.Ct. 1351, 154 L.Ed.2d 1030 (2003). Nellums witnessed the shooting and identified appellant in the courtroom as the shooter. He stated that he was "positive" appellant was the man he saw jump into Christopher's car and shoot McDonald. He described the shooter as wearing blue jeans and a white T-shirt. Mona testified that she saw appellant sitting in a car in the parking lot of the club during the party. Mona described the shooter as wearing blue jeans and a white T-shirt. Owen identified appellant as the person who exited and ran from Christopher's vehicle and as the same person who was apprehended at the Mobil station. Appellant was placed at the scene of the shooting, was identified as the shooter and the person who stole Christopher's vehicle, and was identified as the person who was driving Christopher's car when apprehended a short time later. These identifications, plus the blood and fingerprint evidence, viewed in a light most favorable to the verdict, were sufficient to support a rational jury's finding beyond a reasonable doubt that appellant was the shooter.

### Intent

■ Appellant relies on Williams' testimony that the shooter fired the shots and then said, "Get out of the car" to argue that the evidence is insufficient to establish that he intended to kill anyone. He says he would not have intended to kill the victim if he then yelled at him to get out of the car.

Regardless of anything appellant said before or after he fired the shots, he fired a deadly weapon at close range at the victim who was lying or sitting in the backseat of the car that appellant was attempting to steal. The evidence is sufficient to support a rational jury's finding beyond a reasonable doubt that appellant intentionally caused the victim's death.

### Robbery

■ Appellant argues that because the victim was not the owner of the car, but was only a passenger in the vehicle, the evidence is legally insufficient to prove that appellant robbed him. The jury was instructed that appellant was guilty of capital murder if it found that appellant "did intentionally cause the death of Dexter McDonald by shooting him with a gun, while said defendant was then and there in the course of committing or attempting to commit the offense of robbery of Dexter McDonald." The definitional portion of the jury charge provided that:

A person commits a robbery if, in the course of committing theft, as defined hereinafter, and with intent to obtain or maintain control of the property, he

(a) intentionally, knowingly, or recklessly causes bodily injury to another, or

(b) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

... "Theft" as used herein is the unlawful appropriation of the corporeal personal property of another, with the intent to deprive such other person of said property.

"Appropriation" and "appropriate," as those terms are used herein, mean to acquire or otherwise exercise control over property other than real property. Appropriation of property is unlawful if it is without the owner's effective consent.

... "Owner" means a person who has title to the property, possession of the property, or a greater right to possession of the property than the person charged. "Possession" means actual care, custody, control, or management of the property.

Under the definitions given in the jury charge, the victim was the "owner" of the vehicle if he had title to it, possessed it, or had a greater right to possess it than appellant. The title owner of the vehicle, Christopher Lane, testified that he left the victim and Kevin Williams in possession of the vehicle while he stepped out of it for a minute. He also testified that appellant did not have his permission to be in possession of the vehicle. The evidence is sufficient for a rational jury to find beyond a reasonable doubt that the victim was in possession of the vehicle and had a greater right to possess it than appellant. Point of error two is overruled.

■ In his third point of error, appellant claims that the evidence is factually insufficient to establish his identity as the offender and to establish his intent to kill the victim. In a factual sufficiency review, the appellate court views all the evidence in a neutral light and determines whether evidence supporting the verdict is too weak to support the finding of guilt beyond a reasonable doubt or if evidence contrary to the verdict is strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Zuniga v. State*, 144 S.W.3d 477, 486 (Tex.Crim.App., 2004).

### Identity

Appellant argues that the State's case is based almost entirely on circumstantial evidence, that the person best-positioned to see the shooter testified that appellant had darker skin than the shooter, and that there is no evidence regarding the time or distance between the shooting and appellant's apprehension.

Despite some minor inconsistencies in the testimony, the evidence is not too weak to support the finding of guilt beyond a reasonable doubt. Appellant was identified by two people as being present in the parking lot outside the club during the party. Nellums testified he was "positive" appellant was the shooter. He described appellant as wearing blue jeans, a white T-shirt, and having a bandana over his face. Officer Owen identified appellant as the man who fled the stolen vehicle following the police pursuit and who was later apprehended at the truck stop. Appellant was wearing blue jeans and a white T-shirt, and a bandana was found near him when he was apprehended. Also weighing in favor of a finding that appellant was the shooter is the evidence of appellant's fingerprints on the vehicle and the victim's blood on appellant's jeans. Evidence weighing against a finding of appellant as the shooter includes Nellums' inability to identify appellant in a photo lineup the day after the shooting, and Williams' testimony for the defense that he was positive that the skin color of the shooter was lighter than appellant's. On the whole, the evidence is not so weighted against a finding of appellant as the offender that the guilty verdict should not stand.

### Intent

Appellant argues that the testimony that the shooter shot twice and then said to get out of the car, and that the victim was pulled from the car at the stop sign, sup-

port a conclusion that the shooter "wanted the occupants to get out of the car, not that he intended to kill anyone." Even if the shooter's main objective was to steal the car, such an objective does not foreclose or weigh against a finding that the shooter intentionally killed the victim when he shot at him at close range in the back of the car. The two objectives are not mutually exclusive. The evidence is factually sufficient to support a finding of intent to kill. Point of error three is overruled.

In his fourth point of error, appellant claims that the trial court erred in failing to instruct the jury on the lesser-included offenses of felony murder and murder. A two-step test applies when assessing whether a charge on a lesser-included offense should be given. *Feldman v. State*, 71 S.W.3d 738, 750 (Tex.Crim. App.2002). The first step is to determine whether the offense is actually a lesser-included offense of the offense charged. *Id.* Murder is a lesser-included offense of capital murder. *Id.* Felony murder is a lesser-included offense of capital murder. *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim.App.), *cert. denied*, 528 U.S. 1026, 120 S.Ct. 541, 145 L.Ed.2d 420 (1999). The first prong of the test is satisfied.

The second step of the test requires that the record contain some evidence that would permit a rational jury to find that the defendant is guilty only of the lesser offense. *Feldman*, 71 S.W.3d at 750. There must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense. The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Id.*

The element distinguishing capital murder from felony murder is the intent to kill. *Fuentes*, 991 S.W.2d at 272.

Felony murder is an unintentional murder committed in the course of committing a felony while capital murder includes an intentional murder committed in the course of robbery. *Id.* To be entitled to an instruction on felony murder there must be some evidence that would permit a jury rationally to find the defendant had the intent to commit robbery but not to cause the death of the victim. The evidence reflects that appellant ran up to the car, leaned in, and fired two shots, the second one into the backseat where the victim was seated. Appellant argues that some evidence suggests that the shooter did not even know that the victim was in the car, claiming Kevin Williams testified that the shots were fired from outside the car and that there was testimony that the victim was "slumped over" in the backseat. A closer look at the portion of Williams' testimony relied upon by appellant reflects that Williams did *not* testify the shots were fired from outside the car:

[Prosecutor]. Okay. You said he got into the front seat and you were still in the car.

[Williams]. He hadn't got into the car yet.

Q. You said a gun was in your face?

A. Uh-huh.

Q. And you were sitting in the car. Was he standing outside the car pointing a gun in your face?

A. He was standing outside the car, bent over into the car.

Although the shooter was standing outside of the car when he fired the shots, he was leaning into the car with his gun. Citing two pages of testimony, appellant also claims the evidence reflects that the victim was "slumped over" on the backseat. Review of that portion of the testimony reflects that the victim was intoxicated and was sitting in the backseat with his head leaning against or resting on the window

frame. The witness denied defense counsel's suggestion that the victim was lying down or stretched out on the seat. The trial court did not abuse its discretion in concluding that there was no evidence that would permit a jury rationally to find that appellant did not intend to kill the victim when he fired at him at close range inside the car.

■ In a capital murder case in which there is some evidence that would permit the jury to rationally find that the defendant committed murder under Texas Penal Code Section 19.02(a)(1), but that the additional element in Section 19.03 was not proved, the defendant is entitled to a charge on the lesser included offense of murder. *Moore v. State,* 969 S.W.2d 4, 12 (Tex.Crim.App.1998). In this case, the additional element is robbery. Appellant claims there "was no probative evidence that Dexter McDonald was the one that was robbed." As outlined above, "owner" was defined in the court's charge as a person who has title to the property, possession of the property, or a greater right to possession of the property than the person charged. "Possession" was defined as actual care, custody, control, or management of the property. There was evidence that the victim, who had custody of the car, had a greater right to possession of the car than appellant. There was no evidence that appellant had any right to possession of the vehicle or that the victim did not have any right to be in possession of the vehicle. The trial court did not abuse its discretion in concluding that there was no evidence that appellant did not commit or attempt to commit a robbery. Point of error four is overruled.

■ In his fifth point of error, appellant claims that the trial court erred in overruling his objection to the prosecutor's argument at guilt or innocence that in thirty years as a prosecutor, he had only two cases with fingerprint evidence. In closing argument at guilt or innocence, appellant's counsel argued that it was suspicious that the only fingerprints found on the car were appellant's. The prosecutor responded by arguing:

> These cops weren't lazy. They dusted that car and they found his fingerprints, this guy's fingerprints, yeah, and then, they say, oh, well, the cops must have fabricated it because they didn't find anything else.
>
> Fingerprints are so hard to find this witness testified to you about how they're smudged, they're like this. I've been a prosecutor for 30 years I've had two cases with fingerprints, this is the third.

Appellant objected in part on the ground that the argument was outside the record. His objections were overruled. He again contends the argument was outside the record, and was not harmless given the importance of the fingerprint evidence to the State's case.

■ The prosecutor's reference to evidence in other cases that was not a part of the record in this case was improper, and the trial court should have sustained appellant's objection. Nonetheless, the argument was harmless. Appellant does not claim the error was constitutional in nature. To the contrary, he cites *Mosley v. State,* 983 S.W.2d 249 (Tex.Crim.App. 1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999), as setting out the appropriate harm analysis in these circumstances. In *Mosley,* the Court considered three factors when assessing the impact of the harm arising from jury argument error under Rule of Appellate Procedure 44.2(b), for non-constitutional error: (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) measures adopted to cure the misconduct (the efficacy of any

cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Id.* at 259.

The degree of misconduct here was mild. Albeit inartfully, the prosecutor was attempting to respond to appellant's argument that the fingerprint evidence was suspect. The comment was not reiterated or emphasized by the State and comprised a single sentence within the State's argument. As to the second factor, the trial court gave no curative instruction since it overruled appellant's objection. Finally, the evidence was sufficiently strong absent the prosecutor's reference to the rarity of fingerprint evidence. Appellant was identified by witnesses as the person who entered and exited the vehicle. The fingerprint evidence was not critically necessary to tie appellant to the vehicle. Given the mild nature of the prosecutor's statement in light of the evidence as a whole, the error in the statement was harmless. Point of error five is overruled.

■ In his sixth point of error, appellant claims that the prosecutor erred by arguing at the guilt or innocence phase in such a way as to strike at appellant over the shoulders of his counsel. Appellant did not object to the prosecutor's argument and therefore failed to preserve error. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App.1996), *cert. denied*, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997); Tex.R.App. Proc. 33.1. Point of error six is overruled.

■ In points of error seven through ten, appellant complains that the trial court erroneously overruled several of his challenges for cause. He complains that each prospective juror had a bias against some phase of the law upon which he was entitled to rely. A prospective juror who has a bias or prejudice against any phase of the law upon which a party is entitled to rely is properly challengeable for cause. *Feldman*, 71 S.W.3d at 744; Article 35.16. The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. Before a prospective juror can be excused for cause on this basis, however, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Id.* Great deference is given to the trial court's decision because the trial judge was present to observe the demeanor of the prospective juror and to listen to his tone of voice. *Id.* Particular deference is given when the potential juror's answers are vacillating, unclear or contradictory. *Id.*

■ In point of error seven, appellant claims the trial court erred by denying his challenge for cause to venireperson John Beacom. Appellant challenged Beacom for cause based upon Beacom's statement to the prosecutor during voir dire that "with a child killer or something I would vote the death penalty in a minute." Because neither party questioned Beacom further about his statement, explained to him what the law requires, or asked whether he could follow the law despite his personal views, he was not challengeable for cause on this basis and the trial court did not abuse its discretion in denying appellant's challenge. *Id.*

■ In his eighth point of error, appellant claims that the trial court erred in denying his challenge to venireperson Paula Murray. Appellant contends that Murray was challengeable for cause because she would automatically give the death penalty in a case that did not involve self-defense and would not consider mitigating evidence in assessing punishment. Appellant also claims Murray was challengeable

because she did not understand the term "mitigating circumstances."

During voir dire by the State, Murray agreed that she would be able to listen to all of the evidence and decide how each special issue should be answered. When the mitigation issue was read to her, she stated that she understood it. During questioning by appellant's counsel, Murray agreed that her position on the death penalty was reflected in her statement on the jury questionnaire that "if someone kills someone for any reason other than self-defense they should have the same thing done to them." Then she gave two contradictory answers as to whether she would necessarily find no mitigating circumstances in such a case:

> [Defense counsel]. [A]ssuming that you've answered yes to Number One and there is nothing in the record in the evidence that talks about self-defense and your decision with regards to the guilt or innocence is to decide whether the person does life imprisonment or death. Based on your answers to question Number 22 it appears that you've pretty much decided that it's the death penalty.
> [Murray]. Not necessarily. Depending, I mean, depending on all of the evidence that's shown.

\* \* \*

Q. But you've already decided that the evidence said he's guilty and there's, it's a pretty cold-blooded murder and there's no self-defense or anything like that and I'm saying based on your answer to question Number 22 it seems like that you're not willing to consider anything other than the death penalty with those being the facts, I'm saying is that true? If not, can you explain the inconsistencies in your two answers?
A. It would be true.

When questioned further by the prosecutor, Murray could not think of any mitigating circumstances that would change her answer on that issue. In response to further voir dire by the State, Murray agreed that just because she could not think of any circumstances did not mean that there might not be any number of factors that she would consider that might lead her to answer yes to the mitigation issue. She agreed that she would take mitigating circumstances into consideration and would not automatically answer in such a way as to result in the death penalty. Upon further questioning by defense counsel, Murray again stated that she could not think of a single mitigating circumstance in a case not involving self-defense. When asked if she understood what "mitigation means" Murray stated she did "to an extent" but she could not explain it. Appellant challenged Murray for cause on the ground that she would not take mitigating circumstances into account and did not understand the concept of mitigating circumstances. The trial court denied appellant's challenge for cause.

Neither party explained to Murray about following the trial court's instructions and her oath, and neither asked about her ability to do so. Given the lack of explanation by the parties as to what the law requires, Murray's vacillating and unclear answers, and the fact that jurors are not required to give examples of factors they view as mitigating, the trial court did not abuse its discretion in denying appellant's challenge for cause.

■ In his ninth point of error, appellant claims that the trial court erred by denying his challenge for cause to venireperson Deborah Hawkins. Appellant claims Hawkins was challengeable for cause because she demonstrated a bias in favor of capital punishment and against a

life sentence in capital cases. Appellant relies on a statement made by Hawkins in her juror questionnaire that "no one should be allowed to live for killing someone else." Appellant also points to a portion of Hawkins' voir dire when she became emotional in response to questions about her brother-in-law's murder, and she stated that she would not want someone with her mindset on the jury if she were on trial for murder.

Despite Hawkins' statement in her juror questionnaire, she repeatedly stated during her voir dire that she could be a fair and impartial juror and would listen to the evidence in answering the issues. She agreed that a life sentence may be appropriate in some circumstances. She stated that she could put any personal biases and experiences aside. When asked by the trial court whether she would follow the law and base her decision solely on the evidence in the case, she agreed that she would. In light of Hawkins' apparently contradictory responses, we defer to the trial judge who was best-positioned to evaluate her demeanor and voir dire as a whole. *Soria v. State*, 933 S.W.2d 46, 66 (Tex.Crim.App.1996), *cert. denied*, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997). The trial court did not abuse its discretion in overruling appellant's challenge for cause to Hawkins.

▇ In point of error ten, appellant claims the that trial court erred in denying his challenge for cause to venireperson Roy Page. Appellant claims that Page was challengeable for cause on the grounds that he would be unable to afford appellant his presumption of innocence or right against self-incrimination, that he would give some weight to the grand jury's indictment, and that his experiences regarding parole would influence his verdict.

Page, a former police officer, did express reservations about all of the issues appellant claims rendered him challengeable for cause. However, despite candid statements about his beliefs on these issues, Page consistently agreed that he would follow the court's instructions and the law as given to him in the court's charge. The trial court did not abuse its discretion when it denied appellant's challenge to Page. Points of error seven through ten are overruled.

▇ In point of error eleven, appellant claims that the trial court erred in overruling his objection to testimony regarding the dismissal of a charge on an extraneous offense. During the punishment phase of appellant's trial, Limestone County Sheriff's Deputy R.T. Beck testified that appellant was charged with a shooting in 1998, after he was identified as the shooter in a police lineup. Beck testified that the lineup identification was made without hesitation and was never recanted, but that the charges were later dropped. Beck agreed that all of the victims and the perpetrators involved in the shooting incident had extensive criminal records. Beck also agreed that the reason listed for dismissing the case was conflicting evidence, but that cases are sometimes dismissed because of "who the victims are or what they've done in the past." Appellant raised a timely objection to the relevance of this last statement.

Appellant argues that whether or not cases are sometimes dismissed because of who the victims are and what they have done is not relevant to appellant's case and the punishment issues. He argues that the error was made worse by the prosecutor's suggestion in his jury argument that the Limestone County case was dismissed because the victim was "a nobody" with a criminal record.

"Relevant evidence" is evidence "having any tendency to make the existence of any

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. We disagree with appellant that Beck's statement was irrelevant. The fact that prosecutors and courts sometimes dismiss cases due to the less than ideal credibility of the victim or identification witness may aid the jury in deciding whether the appellant had committed this unadjudicated offense for which the charge against him was dismissed. Thus, it was not error for the judge to overrule appellant's objection. Point of error eleven is overruled.

■ In point of error twelve, appellant claims that the prosecutor committed reversible error when he argued outside of the record in the punishment phase of trial that extraneous offense charges against appellant were dismissed because the victim was "a nobody" and had a criminal record. Appellant concedes that no objection was lodged against the allegedly improper argument, but argues that "when a jury argument is manifestly improper, an objection is not necessary to preserve the issue for appeal." Appellant points to *Janecka v. State*, 937 S.W.2d 456, 474 (Tex. Crim.App.1996), *cert. denied*, 522 U.S. 825, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997), in which the Court stated, "[w]ithout timely and specific objections, the question of allegedly improper closing arguments is not preserved for review *unless manifestly improper.*" (Emphasis added by appellant). Appellant notes that *Janecka* was decided after *Cockrell*, 933 S.W.2d at 89.

In *Cockrell*, the Court held a defendant's failure to object to a jury argument or to pursue to an adverse ruling his objection to a jury argument forfeits the right to complain about the argument on appeal. *Id.* The Court further held that precedent allowing a defendant to complain for the first time on appeal about an unobjected-to, erroneous jury argument that was so prejudicial it could not have been cured by an instruction to disregard was expressly overruled. *Id.* Appellant suggests that since *Janecka* was decided after *Cockrell*, *Janecka* controls.

If the Court had intended in *Janecka* to reinstate the pre-*Cockrell* rule just five days after the mandate issued in *Cockrell*, it would have expressly stated so. This Court has followed *Cockrell* many times. *See Mathis v. State*, 67 S.W.3d 918, 927 (Tex.Crim.App.2002)(declining defendant's invitation to overrule *Cockrell*, and reaffirming rule that even if argument is such that it could not be cured by an instruction, defendant is required to object and request mistrial). Moreover, the statement in *Janecka* was dictum given that the argument in that case was not "manifestly improper." *Cockrell* remains the law. Because appellant failed to object to the jury argument, he has forfeited his right to raise the issue on appeal. Point of error twelve is overruled.

■ In point of error thirteen, appellant claims that the trial court erred by overruling his objection to the introduction of photographs of bombs and weapons made by inmates on the ground that any probative value in such evidence was outweighed by the danger of unfair prejudice.[5] At the punishment phase of trial, appellant called Joseph Keith Price, Prison Warden of the Clements Unit of the Texas Department of Criminal Justice. Price testified about the prison classification system and controls in place to maintain security and safety within the prison system. In rebuttal, the State called A.P. Merillat, a criminal investigator for the Special

---

**5.** Appellant also claims that the photos were irrelevant, but because he failed to object on the basis of relevance at trial, that issue is not preserved for review. TEX.R.APP. P. 33.1.

Prosecution Unit, the entity responsible for prosecuting crimes committed within the prison system. Merillat testified that violence was prevalent within the prison system. Merillat described weapons handmade by inmates, and the photographs at issue were offered in connection with that testimony.

Generally, photographs are admissible if verbal testimony about the matters depicted in the photographs would be admissible and their probative value is not substantially outweighed by any of the Rule 403 counter-factors. *Erazo v. State*, 144 S.W.3d 487 (Tex.Crim.App., 2004). The evidence regarding weapons made by prison inmates was at least marginally relevant to the testimony concerning inmate violence within various classifications of prison society. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Id.* The photos helped to illustrate Merillat's testimony. We see nothing about the photos that rendered their probative value substantially outweighed by their unfair prejudicial effect, and appellant does not articulate anything to suggest otherwise. The trial court was within the zone of reasonable disagreement in overruling appellant's Rule 403 objection. *Moreno v. State*, 22 S.W.3d 482, 487 (Tex.Crim.App.1999). Point of error thirteen is overruled.

■ In his fourteenth point of error, appellant claims that the trial court erred by denying his motion to hold Article 37.071, §§ 2(e) and 2(f) unconstitutional because they fail to *require* the jury to consider mitigation. Appellant does not explain in what way the statute fails to do this.

■ When mitigating evidence is presented, the constitution requires a vehicle by which the jury can consider and give effect to mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. *Raby v. State*, 970 S.W.2d 1, 8 (Tex.Crim.App.), *cert. denied*, 525 U.S. 1003, 119 S.Ct. 515, 142 L.Ed.2d 427 (1998). Jurors individually determine what evidence, if any, mitigates against the imposition of the death penalty and what weight, if any, to give that evidence in its consideration. *Id.* Moreover, Article 37.071 § 2(e) provides that the jury "shall" answer the mitigation issue which directs "consideration of all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant." Article 37.071 is constitutional because it requires the jury to consider all of the evidence and determine "[w]hether ... there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than death be imposed." The trial court did not abuse its discretion by denying appellant's motion. Point of error fourteen is overruled.

■ In his fifteenth point of error, appellant claims that the trial court erred by denying his motion to hold Article 37.071 unconstitutional because it shifts the burden of proof to the accused to prove a mitigating circumstance. We have addressed and rejected identical claims. *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim.App.2003); *Cantu v. State*, 939 S.W.2d 627, 641 (Tex.Crim.App.), *cert. denied*, 522 U.S. 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997). Point of error fifteen is overruled.

■ In his sixteenth point of error, appellant claims that the trial court erred by denying his motion to preclude the death penalty as a sentencing option because the Texas death-penalty scheme violates an accused's right to equal protection under the Fourteenth Amendment to the

United States Constitution. Appellant argues that because Article 37.071 fails to provide a mechanism by which the state determines the death worthiness of the Defendant, it does not provide "some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." Appellant points out that decision-making varies widely from county to county. Appellant relies on *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). We have addressed and rejected such claims. *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim.App.2003). Relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), appellant also argues that the future-dangerousness issue should be included in the indictment and passed upon by the grand jury. This issue has been addressed and rejected as well. *Rayford*, 125 S.W.3d at 533. Point of error sixteen is overruled.

In point of error seventeen, appellant claims that the trial court erred by denying his motion to preclude the prosecution from seeking the death penalty because of the arbitrary way in which it is administered, resulting in cruel and unusual punishment in violation of the Eighth Amendment. Appellant points to the various capital-sentencing schemes enacted in Texas since *Furman*[6] and argues that such inconsistency amounts to the quintessential arbitrariness condemned by *Furman*. We have addressed and rejected similar claims, holding that "the disparate treatment created in our capital punishment scheme by the amendments to Article 37.071 is of a different nature than that which was found unconstitutional in *Furman*." *Matchett v. State*, 941 S.W.2d 922, 933 (Tex.Crim.App.1996), *cert. denied*, 521 U.S. 1107, 117 S.Ct. 2487, 138 L.Ed.2d 994 (1997). Moreover, the two versions of

death-penalty sentencing currently in effect (one applicable to offenses committed prior to September 1, 1991, and the amended version applicable to offenses committed on or after September 1, 1991), do not present an equal protection problem because "those committing the same offense on the same day are subject to the same statutory scheme, [so] they are similarly situated and are similarly treated." *Id.* Point of error seventeen is overruled.

In his eighteenth point of error, appellant claims that the trial court erred by overruling his objections to the court instructing the jury at punishment to decide issues not contained in the indictment. Relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), appellant complains of the jury's passing on the future-dangerousness issue and the mitigation issue when such issues were not alleged in the indictment. "A defendant indicted for capital murder is effectively put on notice that the special issues under Article 37.071 will be raised, so such procedural provisions need not be alleged in the indictment." *Moore*, 969 S.W.2d at 13. Neither does *Apprendi* compel the State to allege the punishment issues contained in Article 37.071 in the indictment. *Rayford*, 125 S.W.3d at 533. Point of error eighteen is overruled.

In point of error nineteen, appellant claims that his death sentence violates the Eighth Amendment to the United States Constitution in that it is cruel and unusual. He contends that imposition of the death penalty in his case particularly, and in all capital cases, violates "evolving standards of decency that mark the progress of a maturing society." The death penalty does not violate the Eighth

**6.** *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

Amendment. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Canales v. State*, 98 S.W.3d 690, 700 (Tex. Crim.App.), *cert. denied*, 540 U.S. 1051, 124 S.Ct. 806, 157 L.Ed.2d 701 (2003). Appellant does not assert anything about the facts of his particular case that would render the imposition of the death penalty unconstitutional as applied to him. Point of error nineteen is overruled.

■ In point of error twenty, appellant claims that his conviction should be reversed and remanded for a new trial because the system used to select the grand jury that indicted him is unconstitutional. Appellant complains for the first time on appeal of the use of the "Key Man System" and asserts, without authority or argument, that he "may challenge the grand jury for the first time on Appeal." Appellant has failed to cite any authority or set forth any argument in support of his contention that the unobjected-to issue is properly presented for review. Appellant has forfeited his claims. TEX.R.APP. P. 33.1 & 38.1(g). Point of error twenty is overruled.

■ In point of error twenty-one, appellant claims that the trial court erred by overruling his objection to the charge at punishment for its failure to instruct the jury that a single hold-out juror on the mitigation issue would result in a life sentence. Appellant acknowledges precedent from this Court to the contrary, but claims that such authority is contrary to United States Supreme Court precedent mandating heightened responsibility in death-penalty cases. We have consistently held that "[t]here is no constitutional prohibition to concealing from the jurors the consequences of their deliberations, so long as they are not misled into believing that ultimate responsibility for the verdict rests elsewhere." *Prystash v. State*, 3 S.W.3d 522, 532 (Tex.Crim.App.1999), *cert. denied*,

529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000). We are not persuaded that there is any inconsistency between such precedent and Supreme Court authority on this issue. Point of error twenty-one is overruled.

■ In his twenty-second point of error, appellant claims that the trial court erred by denying his motion to allow the defense to close arguments on mitigation. Article 36.07 provides that "[t]he order of argument may be regulated by the presiding judge; but the State's counsel shall have the right to make the concluding address to the jury." The trial court did not abuse its discretion by denying appellant's request to close the arguments. Point of error twenty-two is overruled.

The judgment of the trial court is affirmed.

PRICE and JOHNSON, JJ., concur.

WOMACK, J., filed a concurring opinion, in which PRICE, JOHNSON, and COCHRAN, JJ., joined.

WOMACK, J., filed a concurring opinion, in which PRICE, JOHNSON, and COCHRAN, JJ., joined.

Before the citizens who had been summoned were examined for jury service, they answered written questions. Question 22 allowed them to give their views about the death penalty. One prospective juror, Deborah Hawkins, wrote "that no one has a right to kill. And no one should be allowed to live for killing some one else." When she was examined orally, she said she had thought about her position for "quite a few years now," and she had formulated it from something that happened to her brother-in-law. "He was murdered a few years back." That was the only basis for her opinion. She said that the killing "was senseless." Follow-

ing her answer in the record is the court reporter's notation, "(Tears in eyes)." The prospective juror affirmed that she could base her punishment verdict on the evidence, but when she was called on to reconcile those affirmations with her written answer, she said, "I can't. ... I don't know." She consistently maintained that she would base her verdict on the law and the evidence, and she said that she could consider mental illness as a mitigating factor that she could consider in deciding punishment.

The trial court denied the appellant's challenge for cause, and the appellant was required to use one of his allotted peremptory challenges on the juror. Today we find no error because we defer to the trial court's seeing the jurors' demeanors and hearing the jurors' voices. *Ante,* at 667–669. This is a venerable rule for reviewing credibility decisions, to which there is little alternative in a close case. My question is, why permit close cases in selecting jurors?

When a court faces an issue of fact, it must rely on limited sources of information. Only so many witnesses will have relevant information about a contested issue of fact. When evidence conflicts, hard choices must be made. The trial judge is the person whose decision must be respected. But there is ordinarily no such need when it comes to deciding whether a citizen is qualified for jury service. If the question is close, the juror can be sent away.

We said exactly that a few years ago. We applied our harmless-error standard to a line of cases in which we had held that judgments of conviction would be reversed when a State's challenge for cause was erroneously granted. We said, "By the standards of *stare decisis,* analysis of precedent, and logic, th[at] holding ... is unsupportable. It is also contrary to a policy

which we think courts should follow: the liberal granting of challenges for cause. The venire comprises so many jurors who are clearly qualified that it is unnecessary to err by denying a challenge for cause on a close question." *Jones v. State,* 982 S.W.2d 386, 394 (Tex.Cr.App.1998).

Maybe the trial court could see in Venire Member Hawkins's demeanor and hear in her voice something that I cannot read in her words, that she could excuse a murderer from the death penalty. But I do think that, when a potential juror in a capital murder case is crying about the murder of her relative and thinks that no one who has killed another should be allowed to live, we could ask our trial judges to let her go to a court that is trying a theft case and bring in another person for the murder trial. If Ms. Murray were an eyewitness to the crime, she might well be irreplaceable. But as a juror, she easily could have been replaced. I do not say that the trial judge's decision of this close question of fact was wrong. But it was contrary to the policy that courts should follow.