# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00248-CR

**Rigoberto Martinez Jr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
### NO. 60968, HONORABLE JOE CARROLL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Rigoberto Martinez, Jr., guilty of murder, *see* Tex. Penal Code Ann. § 19.02(b)(1) (West 2007), and sentenced him to forty years' imprisonment. In three issues, Martinez argues that the trial court erred in (1) denying his request for a jury instruction on the lesser-included offense of manslaughter; (2) overruling his Rule 403 objection to two photographs of the victim; and (3) failing to give him the correct amount of credit for time served in the county jail. Because we conclude that the trial court made a clerical error on the judgment, awarding Martinez one fewer day of credit for time served than it should have, we modify the trial court's judgment and affirm the judgment as modified.

## BACKGROUND

On the evening of January 11, 2007, Goldsin Nimnuan was at his residence in Bell County with his next-door neighbor, Jennifer Figuera. Figuera was in the kitchen cooking

dinner. Sometime later, Martinez arrived. Martinez was from California but was temporarily in Texas visiting his aunt and uncle and planning to help his grandmother, who was also visiting Texas, return to California safely. Martinez's aunt and uncle lived near Nimnuan, and his uncle and Nimnuan were friends. His uncle took him to Nimnuan's house on a couple of occasions, and Martinez stopped by Nimnuan's house by himself on another occasion. When Martinez arrived at Nimnuan's house on January 11, 2007, he was alone. Sometime later that evening, two more of Nimnuan's friends, Patrick Bennett and Elliot Mars, also arrived at the residence.

While Figuera cooked and spent time on the computer, the four men moved between the living room and one of the two bedrooms in the house, spending their time rolling dice and watching parts of a movie. Some of the men, including Nimnuan and Martinez, smoked marijuana and ingested cocaine. At about 2:00 a.m., Figuera went to sleep in the remaining bedroom. About an hour later, Bennett and Mars left. Martinez testified at trial that after the other men left, he and Nimnuan sat on the couch talking and watching television. Nimnuan then offered him more cocaine, which Martinez accepted. Martinez testified that as soon as he sniffed the cocaine, he felt his nose burn and his eyes begin to water. While he tried wiping his eyes and getting the cocaine out of his nose, he began cursing loudly at Nimnuan, accusing him of giving him bad cocaine. He testified that Nimnuan said many things in response, one of them being, "I wouldn't do you like that, man."

Martinez testified that while he continued cursing at Nimnuan and trying to wipe his eyes, he felt "a body get close" to him and felt himself getting hit in the face. He then felt Nimnuan on top of him, pinning down his shoulder. He testified that he broke free from Nimnuan and then saw Nimnuan reach for something on the floor or in the couch. The next thing he saw was Nimnuan

2

rise up with a gun in his hand. Martinez pushed Nimnuan, knocking the gun out of his hand. At that point, Martinez grabbed the gun. Nimnuan then threw a table at him and came toward him with a knife. Martinez testified that when he saw the knife, he jumped to his left and "heard a shot go off." He testified that he did not realize he pulled the trigger. Nimnuan fell forward and grabbed onto the leg of Martinez's pants, attempting to pull himself up. Martinez tried unsuccessfully to push Nimnuan away. He testified that when he saw that Nimnuan still had the knife, he shot him again. He did not know how many times he shot Nimnuan, but he remembered "waving" the gun around, pulling the trigger. Nimnuan fell to the floor, and Martinez ran out the front door.

Figuera remained in the bedroom during the entire incident. She testified as to what she heard. She was first awakened by the sound of an argument between Nimnuan and someone else in the living room. She heard Nimnuan say, "You know I wouldn't play you like that. I treated you like family." She also heard him say, "Where you want to handle this at? Do you want to handle it outside?" She heard the voice of another man responding to Nimnuan, but she could not hear what the man said. She assumed the voice of the other man was that of Martinez because she knew it was not the voice of either Bennett or Mars, who both had strong accents. Thinking that the argument would soon be over, she went back to sleep. A short time later, she was awakened again, this time by the sound of gunshots. She testified that she heard four of five gunshots in quick succession, followed by the sound of the front door creaking. As soon as she heard the gunshots, she hid between the bed and wall in the bedroom. She had her phone with her. She was unsure of whether the gunshots she heard were real or just part of a movie that she heard playing in the living room, so she called Mars to find out if he was still at the house, and if so, whether he knew what was

3

happening. Mars answered his phone and told Figuera that he was at home. Figuera told him that she thought she heard gunshots, and she asked him to come back to the house. He told her he would be there in about twenty minutes. Figuera moved into the bedroom closet to wait. At one point, she went to the bedroom door and opened it slightly. Through the opening, she saw a beer bottle lying on the floor, which she testified was unusual because Nimnuan would normally not leave a bottle on the floor. She returned to the closet. A short time later, Mars called her and told her that he was parked across the street. Figuera, too afraid to go out the bedroom door, climbed out the bedroom window and ran across the street to Mars's car. When Figuera and Mars noticed that Nimnuan's front door was left slightly open, Figuera called the police.

Meanwhile, after Martinez fled Nimnuan's home, he ran to the home of his aunt and uncle. When he arrived, he went to the backyard, where he took the gun out of his sweatshirt pocket and hid it between a chain-link fence and a piece of metal. He then removed his sweatshirt before ringing the doorbell. His aunt let him inside the house and told him to go to his room. He went to his room and called his brother in California to tell him what had happened. After ending the phone call with his brother, he removed his clothes, including a pair of gloves he was wearing, and put them in the washer. When he removed his gloves, he noticed that he had a cut on his left hand, which stung and was bleeding. He testified that he assumed he had been stabbed by Nimnuan or had accidentally shot himself. He took a shower, put on clean clothes, and sat in his room, looking out the window toward Nimnuan's house. He testified that he was looking for police or Nimnuan, who he was not sure was dead. He fell asleep sitting on the floor and was awakened later by the sound of police cars outside the house. After officers entered his home, he was taken out to a police car

4

while detectives searched the house and yard. Detectives found Martinez's clothes in the washer, his sweatshirt on a stove in the backyard, and the gun wedged against the backyard fence. Martinez's sweatshirt had blood on it, and detectives found a knife in one of the sweatshirt's pockets. At trial, Martinez admitted that the knife found in his sweatshirt belonged to him. Officers arrested Martinez.

Nimnuan was found dead on the floor of his home. Detectives did not find a knife at the crime scene. A medical examiner testified that Nimnuan was shot a total of four times—once in the top of the head from a distance of one to six inches; once in the back, right shoulder from a distance of ten inches to two feet; once in the back, left shoulder from a distance of ten inches to two feet; and once in the lower neck from a distance further than any of the others.

Martinez was indicted for Nimnuan's murder. At trial, the court charged the jury on self-defense. The jury rejected the self-defense theory and convicted Martinez of murder, sentencing him to forty years in prison. This appeal followed.

## DISCUSSION

### *Lesser-Included Offense*

In his first issue, Martinez contends that the trial court erred in denying his request for a jury instruction on the lesser-included offense of manslaughter. We use an abuse of discretion standard in reviewing the trial court's ruling on a request for a lesser-included offense instruction. *See Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004). A defendant is entitled to a jury instruction on a lesser offense if (1) the offense is a lesser-included offense under

article 37.09 of the Texas Code of Criminal Procedure,[1] and (2) the record contains some evidence that would permit a rational jury to find the defendant guilty only of the lesser-included offense. *See Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005).

Martinez meets the first prong of the test because manslaughter is a lesser-included offense of murder. *See* Tex. Code Crim. Proc. Ann. art. 37.09(3) (West 2007); *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). However, Martinez does not meet the second prong of the test because there is no evidence that would permit a rational jury to find him guilty only of manslaughter. A person commits manslaughter if "he recklessly causes the death of an individual." *See* Tex. Penal Code Ann. § 19.04 (West 2007). A person acts recklessly "with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *See id*. § 6.03(c) (West 2007).

---

[1] Article 37.09 states:

> An offense is a lesser included offense if:
>
> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
>
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
>
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
>
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

Tex. Code Crim. Proc. Ann. art. 37.09 (West 2007).

Martinez contends that his testimony that he did not intend to fire the first shot is some evidence that he acted recklessly. That evidence, he argues, combined with his testimony that the remaining three shots were fired in self-defense, would allow the jury to find him guilty only of manslaughter. However, the jury was charged on self-defense, and it rejected that theory. Even if it had not, Martinez's testimony about the first shot is not evidence that he acted recklessly. During direct examination, Martinez testified about firing the first shot as follows:

| | |
|---|---|
| Martinez: | Like I said, I was getting up at the moment. I was kind of hunched over and I was standing up. And when I seen the knife, I moved to my left, kind of like jumped to my left a little and I just heard a shot go off. |
| Defense: | Okay. Was there any other gun in the room besides the one you had in your hand? |
| Martinez: | No. |
| Defense: | Okay. Did you intend to pull the trigger at that moment? |
| Martinez: | I didn't realize that I pulled the trigger. I just heard a shot go off. |
| Defense: | Okay. What happened next? |
| Martinez: | As soon as the shot went off, well, he kind of tumbled and kind of like was falling forward. |
| Defense: | Did you see whether the shot struck [Nimnuan]? |
| Martinez: | No. I thought about it real fast, like you get probably like a split second to think about it, but I don't know if I shot him or not. |

During cross-examination, Martinez testified again about firing the first shot:

Prosecution: Okay. So you move over to the left, he's right here, you've got a gun in your right hand. What happens next?

Martinez: When I was getting up and I moved to my left, he got closer and the gun just went off.

. . .

Martinez: When I went to my left, I was getting up, and I just went like that. I just picked up my hands and it went off.

The court of criminal appeals addressed a similar situation in *Schroeder v. State*, 123 S.W.3d 398 (Tex. Crim. App. 2003). In that case, the defendant testified that he and his wife were arguing and "wrestling around" with a gun when he was suddenly on top of her, things became quiet, and he saw her eyes fluttering. *Id*. at 399. He testified that he must have "blacked out or something," and that he did not remember shooting her. *Id*. The court of criminal appeals held that the defendant's testimony was not evidence of recklessness because it did not establish that at the time of the firing of the gun, the defendant was aware of, but consciously disregarded, a substantial and unjustifiable risk that his wife would die as a result of his conduct. *Id*. at 401. Thus, the defendant was not entitled to a charge on the lesser-included offense of manslaughter.

In the case before us, Martinez's own version of events establishes that he was unaware of the result of his conduct. His testimony shows that he was incognizant of both shooting the gun and whether the bullet struck Nimnuan. He was therefore unaware of the risk of causing Nimnuan's death when he pulled the trigger the first time. Like the court of criminal appeals stated

8

in *Schroeder*, "it is difficult to understand how a person may 'consciously disregard' a risk of which he is unaware." *Id*. Thus, Martinez's testimony about firing the first shot does not establish that he acted recklessly and cannot support a charge on the lesser-included offense of manslaughter. *Id*. Accordingly, we conclude that the trial court did not abuse its discretion in refusing to submit an instruction on manslaughter, and we overrule Martinez's first issue.

### Photographs of Victim

In his second issue, Martinez contends that the trial court erred in overruling his objection to the admission of two photographs of the victim. Specifically, Martinez argues that the prejudicial effect of the photographs substantially outweighs their probative value. The photos of which Martinez complains are State's Exhibits 23 and 24, which are close-up photos of Nimnuan taken at the crime scene. We use an abuse of discretion standard in reviewing a trial court's decision to admit or exclude evidence.[2] *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006). The trial court abuses its discretion only when its decision lies outside the "zone of reasonable disagreement." *Id*.

Martinez bases his argument on Rule 403 of the Texas Rules of Evidence, which states that relevant evidence may be excluded if its probative value is substantially outweighed by

---

[2] Martinez contends that because the trial court did not give its reasoning for overruling his objection to the photos, we should use a de novo standard of review in our Rule 403 analysis. We disagree. First, Martinez does not cite to any legal authority in support of his position. *See* Tex. R. App. P. 38.1(h) (requiring appropriate citations to authorities). Second, a trial judge is not required to place any findings or conclusions into the record when engaging in a Rule 403 analysis, nor did Martinez request that the court do so. *See Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). Rather, once Rule 403 is invoked, a trial judge is presumed to engage in the required balancing test. *Id*. at 195-96. Accordingly, we reject Martinez's argument.

the danger of unfair prejudice. *See* Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). A Rule 403 analysis should include, but is not limited to, the following four factors: (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Id*.

When Rule 403 is raised in the context of photographs, we should consider several factors, including, but not limited to, the following: (1) the number of photographs; (2) the size of the photograph; (3) whether it is in color or black and white; (4) the detail shown in the photograph; (5) whether the photograph is gruesome; (6) whether the body is naked or clothed; and (7) whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph to the appellant's detriment. *Id*.

Exhibits 23 and 24 were identified by Heath Crum, the police officer who took the photos. Crum testified that the photos fairly and accurately represented the crime scene as it looked when officers arrived. Exhibit 23 is a close-up photo of Nimnuan's chest, face, and left arm. The photo depicts a bullet wound in Nimnuan's neck, blood on the floor behind his head, and blood on his neck and shoulder. Exhibit 24 is a close-up photo of the right side of Nimnuan's head, neck, and shoulder. It depicts a bloody wound to his head, blood on the floor behind his head, and blood on his neck and shoulder.

After reviewing the photos, we conclude that the Rule 403 factors weigh in favor of admissibility. First, the photos have substantial probative value. They are probative of the crime

10

scene and the injuries received by Nimnuan, *see Shuffield*, 189 S.W.3d at 788, and they are also probative of the State's theory that Martinez's actions were intentional and not done in self-defense. In the State's closing argument, the prosecutor argued that Martinez's self-defense claim was not credible based on several details shown in the photos, including where Nimnuan's body was found, the direction the blood ran from his wounds, the cut on his head, and the location of the bullet wounds. Second, the photographs had very little potential to impress the jury in an irrational way because they are not overly gruesome. *See id*. at 787-88 (close-up photos of shotgun blasts to victim's head and face not overly gruesome). Third, the State took very little time in developing the photos. The testimony about the photos consists of less than one page out of three volumes of trial testimony. Fourth, the State needed the photos because there were no other close-up, crime-scene photos of Nimnuan's wounds and the blood pattern from the wounds.

In addition to the general Rule 403 factors, the factors relating to photographs in particular also weigh in favor of admissibility. The first factor, the number of photos offered, weighs in favor of admissibility because there are only two photos, both of which are the only photos of their kind. Although the State offered several other photos of the crime scene that included Nimnuan's body, none of them were close-up photos of Nimnuan's wounds. Regarding the second and third factors—the size of the photos and whether they are in color or black and white—we note that the photos in the record appear to be black-and-white copies of the originals and are approximately eight by eleven inches. We assume that the original photos were in color. Although the second and third factors do not weigh in favor of admissibility, they do not render the photos inadmissible. *See id*. at 787-88 (upholding admission of color photos of bullet wounds to victim's head and face);

11

*Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997) (upholding admission of eight-by-ten-inch photos depicting multiple stab wounds to victim's body). The fourth factor, whether the photos are gruesome, also weighs in favor of admissibility. The photos show blood on Nimnuan's neck, shoulder, and behind his head. One of the photos depicts a wound in Nimnuan's neck, and the other photo shows a bloody wound near the top of his head. Although the photos are somewhat gruesome, they are no more gruesome than the facts of the offense itself. *See Williams*, 958 S.W.2d at 196. The fifth and sixth factors—whether the body in the photo is naked or clothed and whether the body was altered after the crime—further weigh in favor of admissibility. Nimnuan is clothed in both photos, and there is nothing in the record to suggest that his body was altered after the crime.

Considering all of the relevant factors, we conclude that the trial court did not abuse its discretion in determining that the probative value of the photos was not substantially outweighed by the danger of unfair prejudice. Accordingly, we overrule Martinez's second issue.

### Credit for Time Served

In his third issue, Martinez argues that the trial court erred in failing to award him the correct amount of credit toward his sentence for the time he had already served in the county jail. The record shows that Martinez was arrested for Nimnuan's murder on January 12, 2007, and that his sentence was imposed on March 28, 2008. The judgment credited Martinez for time served from January 13, 2007 to March 28, 2008. The same day the judgment was entered, the trial judge signed a document filed by Martinez titled, "Defendant's Request for Jail Time Credit," which claimed credit for January 12, 2007 through March 28, 2008. The record makes it clear that Martinez was entitled to credit for time served from January 12, 2007 through March 28, 2008. Thus, the trial

12

court made an apparent clerical error in the judgment in awarding Martinez credit for one fewer day than he was entitled. Accordingly, we modify the trial court's judgment to award credit starting from January 12, 2007, rather than January 13, 2007.

**CONCLUSION**

Because we hold that the trial court did not abuse its discretion either in denying Martinez's request for a jury instruction on the lesser-included offense of manslaughter or in overruling his Rule 403 objection to two photographs of the victim, and because we find an error in the judgment with regard to the credit awarded to Martinez for time served, we modify the trial court's judgment to award credit for time served starting on January 12, 2007, rather than January 13, 2007, and we affirm the trial court's judgment as modified. *See* Tex. R. App. P. 43.2(b).

_____

Diane M. Henson, Justice

Before Justices Patterson, Waldrop and Henson

Modified and, as Modified, Affirmed

Filed:  April 3, 2009

Do Not Publish