NUMBERS 13-06-372-CR


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


HARRY ANTHONY BARGAS, Appellant,

 

v.


THE STATE OF TEXAS, Appellee.

 
 

On appeal from the 24th District Court of Calhoun County, Texas

 


MEMORANDUM OPINION


Before Justices Yañez, Rodriguez, and Garza


Memorandum Opinion by Justice Garza


 A jury found appellant, Harry Anthony Bargas, guilty of capital murder in the course
of committing or attempting to commit aggravated sexual assault or burglary of a habitation. 
See Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2006). The State did not seek the
death penalty. The trial court assessed punishment at life imprisonment. By three issues
on appeal, appellant claims: (1) the evidence is legally insufficient to identify him as the
perpetrator, (2) the evidence is legally insufficient to support a finding that he committed
burglary and aggravated sexual assault, and (3) the trial court erred in refusing to submit
a charge on the lesser-included offense of murder. We affirm.

I. Factual and Procedural Background

 Appellant and Georgina Villegas started dating in 2002. They lived together off and
on from 2002 up until the time of Georgina's death on March 13, 2004. They had a "roller-coaster" relationship during that period. According to appellant, he went over to Georgina's
residence on March 9, 2004 to tell her that their relationship was over. According to
Georgina's family and friends, Georgina did not want to have anything to do with appellant,
but appellant would not leave her alone. Georgina's parents found her dead in her home
on the morning of March 13. It appeared that someone had broken in through a back door
and it also appeared that Georgina had been strangled and sexually assaulted. Port
Lavaca police officers conducted an investigation, and after speaking to appellant and after 
examining appellant's body, officers arrested and subsequently charged appellant with
capital murder in the course of committing or attempting to commit burglary and in the
course of committing and attempting to commit aggravated sexual assault. Appellant
pleaded "not guilty." A jury found appellant guilty, and the trial court sentenced appellant
to life imprisonment. This appeal ensued. 

II. Legal Sufficiency

 By his first and second issues, appellant claims the evidence is legally insufficient to
(1) identify him as the perpetrator, and (2) support the jury's finding that he committed the
murder in the course of committing or attempting to commit burglary and aggravated sexual
assault. 

a. Standard of Review 

 When there is a challenge to the legal sufficiency of the evidence to sustain a
criminal conviction, we consider whether a rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Hooper v. State, 214 S.W.3d
9, 13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979);
Powell v. State, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); Guevara v. State, 152
S.W.3d 45, 49 (Tex. Crim. App. 2004)); Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex.
Crim. App. 2005). We review all the evidence in the light most favorable to the verdict,
assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and
drew reasonable inferences in a manner that supports the verdict. See Griffin v. State, 614
S.W.2d 155, 159 (Tex. Crim. App. 1981). It is not necessary that every fact point directly
and independently to the defendant's guilt; it is enough if the conclusion is warranted by the
combined and cumulative force of all the incriminating circumstances. Johnson v. State,
871 S.W.2d 183, 186 (Tex. Crim. App. 1993). We consider even erroneously admitted
evidence. Id. The jury is the exclusive judge of the credibility of witnesses and of the
weight to be given their testimony. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App.
1996). Reconciliation of any conflicts in the evidence is within the exclusive province of the
jury. Id. In a legal sufficiency of the evidence review, the essential elements of the offense
are those of a hypothetically correct jury charge for the offense in question. Hooper, 214
S.W.3d at 14 (citing Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Where
the indictment and the trial court's charge authorize the jury to convict on more than one
legal theory, as they did in this case, the verdict of guilt will be upheld if the evidence is
sufficient on any of the theories possible. Id. (1)
 

b. Applicable Law

 A person commits the offense of capital murder if the person commits murder as
defined under section 19.02(b)(1) of the Texas Penal Code and he intentionally commits
the murder in the course of committing or attempting to commit burglary or aggravated
sexual assault. Tex. Penal Code Ann. § 19.03(a)(2). Under the provisions of section
30.02(a) of the Texas Penal Code, a person commits the offense of burglary if that person
enters a habitation, without the effective consent of the owner (1) with intent to commit a
felony, theft, or an assault or (2) commits or attempts to commit a felony, theft, or an
assault. Id. § 30.02(a)(1), (3) (Vernon 2003). A person commits the offense of assault if
the person intentionally, knowingly, or recklessly causes bodily injury to another;
intentionally or knowingly threatens another with imminent bodily injury; or intentionally or
knowingly causes physical contact with another when the person knows or should
reasonably believe that the other person will regard the contact as offensive or provocative. 
Id. § 22.01(a)(3) (Vernon Supp. 2006). A person commits aggravated sexual assault if he
intentionally or knowingly causes the penetration of the anus or sexual organ of another
person by any means without that person's consent. See id. § 22.021(a)(1)(A)(i) (Vernon
Supp. 2006). 

c. Evidence

 Rebecca Vargas testified that she worked with Georgina and that Georgina "was
more like a sister to me than a friend." Vargas testified she knew Georgina for about ten
years, and they had worked together for five years. Vargas testified that she knew about
Georgina's relationship with appellant. Vargas described the relationship as "okay" in the
beginning, but "very roller coaster" and "off and on" towards the end. Vargas stated that
appellant would call Georgina at work anywhere from "five to twenty times a day." Vargas
testified that on March 9, 2004, Georgina was upset because appellant called her and told
her he was going to kill himself. That evening, Vargas, Georgina, Georgina's children,
Georgina's sister-in-law, and Georgina's sister-in-law's children, had dinner at Georgina's
home. Vargas explained that they did not talk about appellant's suicide threat that night.
Instead, they ate burgers, talked, and went home early. Vargas testified that the next day,
on March 10, Georgina told her that, after they left Georgina's house the night before,
appellant had come over and wanted to talk. Georgina told Vargas that she did not open
the door, but, instead, called the police because her son was scared. Vargas also testified
that Georgina was excited that week because she was going to take that Thursday and
Friday off to go to Corpus Christi. Vargas stated that Georgina had her nails done that
week. Vargas testified that Georgina called her at work on the morning of March 11. 
Vargas explained that Georgina was upset, even "hysterical and crying," because appellant
had gone to her house, wanting his TV, DVD player, and engagement ring. Vargas agreed
that things between Georgina and appellant had gotten worse that week. Vargas testified
that Georgina told her that appellant threatened to become violent if he caught Georgina
with another man. Vargas spoke to Georgina on Friday, March 12, after 4:30 p.m., after
Georgina returned from Corpus Christi. Georgina went to Vargas' home around 7:00 or
7:30 p.m. that Friday night. After staying at Vargas' home for a while, at around 9:00 p.m.,
Georgina went to appellant's house because he wanted to talk to her. Vargas testified that
she went to buy drinks for her home and that on her way, she took a detour by appellant's
house to see if Georgina was there. Vargas did not see Georgina's vehicle there. However,
shortly after Vargas drove by appellant's house, Georgina called Vargas and told her she
was on her way home. Vargas went over to Georgina's house around 10:00 or 10:15 that
evening. Vargas and Georgina then went over to Vargas' home before 11:00 p.m. Vargas
and Georgina then drove to Whataburger shortly after midnight. On their way to
Whataburger, Georgina said, "[o]h, hell." Vargas looked up and noticed appellant's vehicle
"backing up fast." Georgina then called appellant. Vargas heard Georgina say, "what are
you doing, what are you doing" and "leave me alone, just leave me alone already." Vargas
testified that Georgina was upset and that Georgina stated, "I know he's never going to
leave me alone." The Whataburger receipt reflects that their order was placed at 12:21 a.m.
on March 13, 2004. Vargas and Georgina took their food back to Vargas' house. Georgina
left Vargas' house at about 1:00 a.m. Vargas testified that Georgina's nails were in good
shape and were without damage that night.

 Port Lavaca Police Officer Eric Hart testified that he received a call for service at
about 3:00 a.m. on March 10. When he arrived, appellant was near the front door of
Georgina's house. Appellant was asked to leave and he complied. Hart described
appellant as "calm and very compliant." 

 Elizabeth Venecia testified she saw appellant on Friday, March 12, at "Venecia's Bar"
around 9:00 p.m., and he stayed until about 10:30. Venecia and her husband then went
to another bar, "High Tides," after 10:30 p.m. They saw appellant there with his friends. 
Appellant did not appear upset. Venecia and her husband left at about 11:45 p.m., and
appellant was still there when they left.

 Port Lavaca Police Officer Peter Nessa testified that he was on patrol from Friday
March 12 at 6:45 p.m. until 7:00 a.m. on March 13. Nessa testified that, at about 2:26 a.m.
on March 13, he noticed a vehicle coming from the direction of Georgina's home. Nessa
observed the vehicle's tires strike the lane markers on the street. He explained this
indicated a possible intoxicated driver. Nessa called in the license plate of the vehicle. The
licence plate results indicated that the vehicle belonged to appellant. Nessa followed the
vehicle to an apartment complex, where he observed the driver "hurriedly" walk toward the
apartment door. Nessa explained that the individual appeared to be "trying to conceal who
he was, what he was doing. He didn't want to see me, he didn't want me to see what he
was doing." Nessa did not arrest or detain the individual because "there was no violation
of the law." 

 Michelle Morales, Georgina's ex-sister-in-law, testified that Georgina visited her in
Corpus Christi on March 11. She testified that Georgina received numerous telephone calls
from appellant. Morales testified that Georgina ignored the calls. At about 1:30 or 2:00
a.m. on Friday, March 12, Georgina received a phone call from appellant. At that time,
Georgina asked appellant to stop calling and to leave her alone. Georgina received three
more calls that night. Morales testified that she observed bruises and bite marks on
Georgina and that Georgina attributed them to appellant. Morales further stated that
Georgina told her that appellant wanted anal sex but she would not allow it. Morales also
testified that on Thursday night, March 11, while they were out dancing and drinking beer
at "Roper's" night club in Corpus Christi, appellant called Georgina's cell phone. However,
Georgina did not answer; instead, a guy sitting at the table with them answered the phone
and said, "'look, dude, she doesn't want to talk to you' and hung the phone back up." 

 Appellant testified that, two days prior to her death, he told Georgina that if he caught
her with another man, he would "rip their penis off and stuff it down their throat." Appellant
also admitted to having threatened to kick Georgina's door down. Appellant had difficulty
explaining and was vague as to his whereabouts between 12:30 a.m. and 8:00 a.m. on
Saturday, March 13. Appellant also testified that the last time he had sexual intercourse
with Georgina at his apartment was on March 9, 2004. The last time he had sexual
intercouse with Georgina at her home was during the week of March 1, 2004. He denied
wanting to engage in anal intercourse with Georgina.

 Mary Louise Villegas, Georgina's mother, testified that she and her husband went
to Georgina's house "a little bit before nine" on the morning of March 13. She and her
husband found Georgina laying face down. Villegas grabbed Georgina's arm and felt that
it was cold. Georgina was covered with a blanket up to her shoulders, and was wearing her
pajama top. Villegas uncovered Georgina's body and saw that Georgina did not have any
clothes on her lower body. Villegas attempted using the kitchen phone to call the police,
but she "couldn't get through." Villegas also tried using a phone located in Georgina's
bedroom, but could not get through. She tried locating Georgina's cell phone but could not
find it. Villegas ran across the street to a neighbor's house and phoned the police. 

 Officer John Shultze testified that he was on duty on Saturday, March 13, when he
received a call regarding an "unattended death." Shultze entered Georgina's residence and
went to the bedroom. There, he found Georgina lying on the bed. Shultze testified that the
back door "looked like it had been forcibly opened." 

 Detective Donald Keil testified that the telephone cord at Georgina's house had been
"unplugged and cut" and there were "pry marks" on the door. He testified that the only thing
missing from Georgina's house were her panties. He testified that the back door was
broken in and that the door's striker plate and splinters were found on the kitchen floor. Keil
testified that the evidence indicated Georgina engaged in a struggle prior to her death. Keil
noted that a small piece of skin tissue was found on the necklace worn by Georgina at the
time of her death. Appellant had a "scratch mark or injury" on his right thumb which "could
have been caused by the necklace when [Georgina] was strangled." Keil testified that
Georgina's nails were in a damaged condition. He further testified that at the time of his
arrest on March 13, appellant had scratch marks on his lower back sides. Keil explained
that the scratch marks were consistent with marks left by a woman's fingernails. He further
elaborated that the "scratch mark" evidence was important to the case given the officers'
conclusion that Georgina was "strangled from behind and during th[e] struggle could have
scratched [appellant] in that area." A pillow case and bed sheets were also retrieved from
Georgina's house and were sent for DNA analysis. Keil also testified that appellant's phone
records showed multiple daily calls to Georgina from March 7, 2004 to March 13, 2004. Dr. Elizabeth Peacock, Deputy Medical Examiner for Travis County, testified that she
first saw Georgina's body at 11:00 a.m. on March 14. She identified Georgina's cause of
death as "strangulation" either manually or using ligature, perhaps both. She testified that
Georgina was involved in a struggle prior to her death. Dr. Peacock further stated that her
examination of Georgina's body indicated:

Dilation and tearing of the anal orifice, right at the rim, and then it showed
some trauma, hyperemia is what we call it, or reddening, some damage to the
mucosal layers, without perforation of the rectum, but damage to the inside
of the rectum for about one-and-a-half inches above the anal ring.


Peacock testified that this indicated that "there had been some penetration of the rectum." 
She explained that there was no "fiber matter or anything to indicate what it was, there was
no, like, wood chips or paint fibers or anything to indicate that there was an object used, but
I cannot rule out an object." She agreed that the penetration could have been made by a
finger or a male penis. Dr. Peacock agreed that this kind of injury and trauma "can be seen
with consensual anal intercourse." However, she explained, "there was a lot of hemorrhage
inside [Georgina's] pelvis but outside the rectum. As I stated before, there was no
penetration through the rectum but there was a lot of hemorrhage around it, which indicates
some degree of force." Dr. Peacock explained this is "not the kind of injury that you can get
with--or usually get with consensual intercourse. I've only seen probably about four cases
in my whole career, two of which there was a history of consensual sexual intercourse or
anal intercourse." Dr. Peacock elaborated that "the mucosal reddening and sluffing of the
mucosa, which is the interlining, that's normal with consensual sex. But the bruising on the
outside, inside the pelvis but on the outside of the rectum, you don't usually see with
consensual sex." She also testified that Georgina's body had bruises and contusions
caused by blunt force injury, such as "something hitting it, something squeezing it with
enough pressure to break the capillaries under the skin." She stated that the bruising and
contusions could be defensive injuries. Dr. Peacock explained that Georgina's bruises were
very red and probably developed within a few hours before her heart stopped. Georgina
exhibited visible trauma to her mouth also caused by blunt force. Dr. Peacock also
indicated that Georgina suffered "a lot of contusion of the scalp and of the temporal muscle
on the right side." On cross-examination, Peacock testified that the rectal tearing on
Georgina's body was very recent. She further testified that the lines on Georgina's neck
could indicate that a belt, or a necklace such as the one found on Georgina, was used to
strangle her. 

 Detective Walton testified that he believed Georgina "was sexually assaulted and
strangled from the rear because of the position of her body when it was discovered." He
testified that Georgina's left arm was beside her and her right arm was behind her. Walton
testified that he observed that the left and right side of appellant's back had "three to four
long thin scrapes across the lower portions of his back." Walton believed the marks "were
consistent with marks that would be left by a lady's fingernails." Walton also pointed out
inconsistencies in appellant's testimony regarding his whereabouts the evening of March
12 leading up to the early morning hours of March 13. 

 Patricia Graham, the supervisor of the Texas Department of Public Safety Crime
Laboratory in Corpus Christi, testified that she compared some exhibits submitted for
analysis with appellant's blood specimen. One of the exhibits was the necklace worn by
Georgina at the time of her death. Graham testified that a small piece of skin tissue
extracted from the necklace was consistent with appellant's DNA profile. She explained that
the probability that the DNA belonged to someone other than appellant was "one in 51.76
billion for Caucasians, one in 159.4 billion for Blacks, and one in 434.6 billion for Hispanics." 
Graham testified that appellant is Hispanic. Another exhibit consisted of fingernail clippings
taken from Georgina's left and right hands. Graham testified that fingernail clippings taken
from Georgina's right hand were consistent with a mixture from appellant and Georgina's
DNA. Graham explained that the probability that the DNA recovered from this sample
belonged to some one other than appellant was "approximately one in 317--317,900 for
Caucasians, and one in 7,315,000 for Blacks, one in 420,300 for Hispanics." DNA results
from Georgina's left-hand fingernails were also consistent with a mixture from appellant's
and Georgina's DNA. The probability that the DNA recovered from this sample belonged
to someone other than appellant was "[a]pproximately one in 28.69 million for Caucasians,
one in 464.7 million for Blacks, and one in 83.06 million for Hispanics. A third exhibit
consisted of a bed sheet and blanket removed from Georgina's bedroom. Graham testified
that appellant's DNA was also present on the bed sheet and blanket and that the probability
that the DNA found on the blanket belonged to someone other than appellant was "one in
79.3 trillion for Caucasions, one in 21.72 quadrillion for blacks, and one in 1.33 quadrillion
for Hispanics," and for the bed sheet, "one in 125.4 million for Caucasions, one in 1.178
billion for Blacks, and one in 553.4 million for Hispanics." Graham also testified that
Georgina's DNA was present on appellant's underwear and that three pubic hairs belonging
to appellant were collected from the bedding. The probability that the pubic hairs belonged
to someone other than appellant were "one in 1.085 quadrillion for Caucasians, one in 18.2
quadrillion for Blacks, and one in 13.77 quadrillion for Hispanics." Graham noted that
appellant's DNA was not found in Georgina's vagina or anus.

d. Analysis

 Viewing the evidence in the light most favorable to the verdict, we hold the evidence
is legally sufficient for a rational jury to find the essential elements of capital murder beyond
a reasonable doubt. Specifically, that appellant was the perpetrator who caused Georgina's
death. We further conclude that a rational trier of fact could have found beyond a
reasonable doubt that appellant murdered Georgina in the course of committing or
attempting to commit aggravated sexual assault. (2) Accordingly, appellant's first and second
issues are overruled.

III. Jury Charge

 By his third issue, appellant claims the trial court erred by failing to instruct the jury
on the lesser-included offense of felony murder. See Tex. Penal Code Ann. § 19.02(b)(1)
(Vernon 2003); Tex. Code Crim. Proc. Ann. arts. 37.08, 37.09 (Vernon 2006). Specifically,
appellant argues he was entitled to the instruction because the State failed to prove
appellant entered Georgina's residence without consent or that appellant penetrated
Georgina's anus without consent. The State responds that evidence shows that no rational
jury could have found appellant guilty of felony murder.

 Texas courts employ a two-prong test in determining whether an instruction on a
lesser included offense must be given. Hampton v. State, 109 S.W.3d 437, 440 (Tex. Crim.
App. 2003). Whether the instruction is requested by the defendant or the state, both prongs
must be satisfied. Id.; Arevalo v. State, 943 S.W.2d 887, 890 (Tex. Crim. App. 1997). First,
the court determines whether the lesser offense is a lesser-included offense of the offense
charged as set forth in article 37.09. Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App.
1998). Second, the court determines whether there is some evidence that would permit a
rational jury to find that, if guilty, the defendant is guilty only of the lesser offense. Id. In
other words, there must be some evidence from which a rational jury could acquit the
defendant of the greater offense while convicting him of the lesser offense. Threadgill v.
State, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004). 

 Felony murder is a lesser-included offense of capital murder. Salinas v. State, 163
S.W.3d 734, 741 (Tex. Crim. App. 2005). Thus, the first prong here is satisfied. With
respect to the second prong, there are two ways in which the evidence may indicate a
defendant is guilty only of the lesser offense. Saunders v. State, 840 S.W.2d 390, 391
(Tex. Crim. App. 1992). First, there may be evidence which refutes or negates other
evidence establishing the greater offense. Schweinle v. State, 915 S.W.2d 17, 19 (Tex.
Crim. App. 1996). Second, a defendant may be shown to be guilty of the lesser offense if
the evidence presented is subject to different interpretations. Id. 

 We must consider all the evidence introduced at trial, whether produced by the State
or by appellant. Enriquez v. State, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000); Penry v.
State, 903 S.W.2d 715, 755 (Tex. Crim. App. 1995). Anything more than a scintilla of
evidence is sufficient to entitle a defendant to a lesser charge. Forest v. State, 989 S.W.2d
365, 367 (Tex. Crim. App. 1999). The evidence must establish the lesser included offense
as a "valid, rational alternative to the charged offense." Arevalo, 943 S.W.2d at 889.

 Here, the record shows Georgina refused to comply with appellant's request for anal
sex. Although Dr. Peacock agreed that the injury sustained by Georgina as a result of the
anal penetration "can be seen with consensual anal intercourse," she did explain that given
the hemorrhaging inside of Georgina's rectum and the indication of force, Georgina's injury
was "not the kind of injury that you can get with--or usually get with consensual
intercourse." The record also contains Dr. Peacock's testimony that Georgina's body had
bruises, contusions on both her body and head caused by blunt force injury, and visible
trauma to her mouth also caused by blunt force injury. Given this testimony alone, we
conclude the second part of the test for determining whether appellant was entitled to an
instruction on the lesser-included offense is not satisfied (i.e., there must be some evidence
that if the defendant is guilty, he is guilty only of the lesser included offense). Arevalo, 943
S.W.2d at 889; Schweinle, 915 S.W.2d at 19. Accordingly, we conclude the trial court did
not err when it denied appellant's request for the jury charge to include the lesser-included
offense of felony murder. Appellant's third issue is overruled.

IV. Conclusion

 The judgment of the trial court is affirmed. 



 _________________________

 DORI CONTRERAS GARZA,

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this the 31st day of August, 2007.
1. Paragraph one of the indictment alleged that:


Appellant, on or about March 13, 2004, and before the presentment of this indictment, in said
County and State, did then and there unlawfully, in the course of attempting to commit and
committing Burglary of a Habitation owned by Georgina Villegas, did there and then
intentionally commit murder by causing the death of an individual, Georgina Villegas, by then
and there strangling her.

 

Paragraph two alleged that:


Appellant, on or about March 13, 2004, and before the presentment of this indictment, in said
County and State, did then and there unlawfully, in the course of attempting to commit and
committing Aggravated Sexual Assault on Georgina Villegas, did there and then intentionally
commit murder by causing the death of an individual, Georgina Villegas, by then and there
strangling her.

2. Because we conclude the evidence was sufficient to support the jury's finding that appellant committed
murder in the course of committing or attempting to commit aggravated sexual assault, we need not address
his argument as it relates to the sufficiency of the evidence supporting the aggravating factor of burglary. See
Hooper v. State, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). 

 

In any event, we would also conclude that the evidence supporting the jury's finding that appellant committed
murder in the course of committing or attempting to commit burglary is legally sufficient. When a defendant
is charged under section 30.02(a)(3), as in this case, the State is not required to prove intent to commit the
felony of theft at the time of the entry. Instead, the State must prove the defendant intentionally or knowingly
entered the habitation without the owner's consent and, while inside, committed or attempted to commit a
felony, i.e., murder. See Tex. Penal Code Ann. § 30.02(a)(3) (Vernon 2003).