Opinion filed April 24, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed April 24,
2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-07-00041-CR 

                                                     __________

 

                         MICHELLE
CHRISTINE THOMAS, Appellant

                                                             V.

                                        STATE
OF TEXAS, Appellee

 



 

                                         On
Appeal from the 104th District Court 

                                                          Taylor
County, Texas

                                                  Trial
Court Cause No. 15960B

 



 

                                             M
E M O R A N D U M   O P I N I O N

Michelle
Christine Thomas was indicted for murdering Ricky Lynn Burleson.  The jury
found Thomas guilty and assessed her punishment at thirty-seven years
confinement.  We affirm.

I.
Background Facts

Thomas
shared a complicated relationship with Chris Harper.  They had a daughter
together, used drugs together, and previously were engaged to be married B even though at the time
she was married to someone else.  On May 27, 2005, they celebrated their
daughter=s birthday
and that night went to dinner.  During dinner, Thomas told Harper that Burleson
had a tape of her committing an assault and that he was using the tape to
threaten her.  After dinner, they went to her home and discovered that Burleson
had broken in and was still inside.  Thomas called the police.  They responded,
told Burleson to leave, and put him on a trespass notice.








Thomas
and Harper spent the night together.  The next morning they got into a fight,
and Harper left.  Late that night, Thomas called Harper.  She was upset. She
said that she had gotten herself into a problem and needed help.  Harper went
to her house and noticed a van parked beside it.  He entered through a side
door into a bedroom.  When he stepped inside, he saw that Burleson was lying
face down on the floor in a small pool of blood, that Thomas was sitting on a
bed, and that a pipe wrench was lying by the bed.  They decided to take
Burleson=s body to the
country.  Neither  mentioned calling the police.  Harper loaded the body into
Burleson=s van.  He
told Thomas to clean up the blood with hydrogen peroxide and to check for blood
signs with a black light.  They took Burleson=s
body to a rural area and hid it.  On the way back to town, Thomas offered to
dispose of the van, and they left it near her house.

After
Burleson=s death,
Thomas engaged in a number of apparently fraudulent transactions using his bank
account.  She made four deposits into Burleson=s
checking account in June.  Each time, she received cash back as part of the
transaction.  When bank tellers asked about Burleson, she told them that he was
ill.  On June 18, she took a $4,500 check to the bank.  She attempted to
deposit $900 into his account and to keep $3,600 in cash.  Bank officials
refused to consummate the transaction and told Thomas that Burleson needed to
personally come to the bank.

A
week or two after Burleson=s
death, Thomas told Harper that she had taken care of Burleson=s body and had burned the
area.  Harper was concerned because nothing had happened to Burleson=s van, so he drove to the
site where they dumped Burleson=s
body.  The body was still there and had not been burned.  He returned to town
and confronted Thomas.  He was angry because she had given him a very detailed
story about how she and a friend had dismembered and disposed of the body.  Thomas
responded by threatening to pin the murder on him.  Two or three weeks later,
Harper panicked after undercover police officers started looking for him, after
he was unable to locate Thomas, and after he noticed that Burleson=s van was gone.  Harper
took his daughter and drove to Fort Worth.  His truck overheated and damaged
the motor.  Eventually, his mother had to come get his daughter.  Harper tried
to kill himself by asphyxiation using his truck exhaust but ran out of gas.  He
then convinced his dad to drive him back to Abilene.








When
Harper returned to Abilene, he successfully contacted Thomas and learned that
she had not disposed of the van.  They concluded that the police had it and
decided to flee.  Harper=s
father drove them back to his truck in Fort Worth.  They stayed in Fort Worth
two days before returning to Abilene and separating.  Approximately one month
later, Thomas called Harper.  They got into a fight when he refused to pick her
up.  She again threatened to blame him for Burleson=s murder.  Harper moved Burleson=s body that night in
response to her threat.  By this time, the body was decomposed, and only the
skeleton remained.  Harper tried to sink the remains in a lake but was unable
to do so because it was too windy.  He decided to hide the remains near the
lake and to come back later.  His mother, however, convinced him to talk to the
police, and around July 27, 2005, he took them to Burleson=s remains and also showed
them where Burleson=s
body was originally dumped.

Thomas
was already in custody on unrelated charges.  Sergeant Lynn Beard contacted
her, and she gave a statement on July 27.  She told Sergeant Beard that
Burleson came to her house to buy drugs and that, while she was getting him
methamphetamine, he jumped her.  During their struggle, she hit him on the head
with a pipe wrench.  He fell down, and she hit him again.  She panicked and
called Harper.  He came over, and when Burleson started to wake up, Harper
choked him until he passed out.  They decided to take Burleson to the country. 
They tied him up.  While they were driving, Burleson woke up.  Harper choked
him again until he passed out.  When they got to their destination, they
realized that Burleson had died.

Thomas
requested a second interview on August 4.  In this statement, Thomas contended
that Burleson attacked her and stabbed her in the left breast with a knife. 
She told Sergeant Beard that Harper came in during their struggle and that he
choked Burleson until he passed out.  She said that she originally lied about
hitting Burleson with a pipe wrench because she did not want to get Harper into
trouble.

Thomas
requested a third interview on August 9.  During this interview, she denied
hitting Burleson and claimed that Harper killed him.  She said that she and
Harper were trying to reconcile and that he was present when Burleson showed up
to buy drugs.  When she went to get some methamphetamine, Burleson attacked her
and stabbed her in the breast.  Harper came to her defense and choked Burleson
to death.  They tied up the body and dumped it in the country.








Thomas
was indicted for murdering Burleson.  Harper was charged with and pleaded
guilty to tampering with evidence.  Thomas=s
indictment contained two paragraphs.  The first paragraph alleged that Thomas
intentionally and knowingly caused Burleson=s
death by striking him with a pipe wrench or other unknown object, by choking
him, and by manner and means unknown.  The second paragraph alleged that Thomas
committed an act clearly dangerous to human life causing Burleson=s death by striking him
with a pipe wrench or other unknown object, by choking him, and by manner and
means unknown.  The jury found Thomas guilty of murder as alleged in the second
paragraph and assessed her punishment at thirty-seven years confinement. 
Harper, conversely, received a five-year sentence.

II.
Issues on Appeal

Thomas
challenges her conviction and sentence with three issues.  She contends that
the trial court abused its discretion by admitting a photograph of Burleson
into evidence during the punishment phase of the trial, that the evidence was
factually insufficient to sustain a guilty verdict, and that the State did not
properly corroborate her pretrial confession.

                                                                    III. 
Analysis

A. 
Burleson=s
Photo. 

During
the guilt/innocence phase of the trial, the State showed Roberta Burleson a
photo.  Roberta was Burleson=s
former wife.  They were married for twenty-two years and divorced because of
his drug use.  Roberta testified that the photo was a picture of Burleson that
was taken while they were on a cruise.  Roberta saw Burleson in March 2005.  At
that time, Burleson was Areal
thin,@ had a gray
complexion, and did not look healthy.  He did not look the way he appeared in
the cruise picture.  The State did not offer the picture into evidence or make
any further reference to it at that time.

During
the punishment phase, the State called Burleson=s
son, Nathan Burleson.  Nathan testified that his father=s drug problem became bad after the divorce
and that his father looked weak and malnourished.  Nathan identified his father=s cruise picture.  He
testified that the picture was taken long ago during a happier time.  The State
offered the cruise picture, and Thomas objected.  The trial court overruled the
objection and admitted the photo.  Thomas argues that the trial court abused
its discretion because the photograph was irrelevant to her punishment and that
it inaccurately depicted Burleson at the time of his death.

 








1.  Standard of Review.

We
review the trial court=s
admission of evidence under an abuse of discretion standard. Weatherred v.
State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). A trial court does not
abuse its discretion if its ruling is within the zone of reasonable
disagreement. Id. 

2.  Is the Photograph Admissible?

A
photograph is admissible if it is relevant and if it is an accurate
representation of its subject as of a given time.  DeLuna v. State, 711
S.W.2d 44, 46 (Tex. Crim. App. 1986).  Relevant evidence is defined as Aevidence having any
tendency to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be
without the evidence.@ 
Tex. R. Evid. 401.  As a general
rule, if verbal testimony regarding what is depicted on the photograph is
admissible, the photograph itself is admissible.  Threadgill v. State,
146 S.W.3d 654, 671 (Tex. Crim. App. 2004).

The
general relevancy rule, however, is not a perfect fit when considering evidence
offered during the punishment phase.  Rogers v. State, 991 S.W.2d 263,
265 (Tex. Crim. App. 1999).  Trial courts are authorized to admit punishment
evidence about Aany
matter the court deems relevant to sentencing.@  
Tex. Code Crim. Proc. Ann. art.
37.07, ' 3(a)(1)
(Vernon Supp. 2007).  Under this provision, relevant punishment evidence is
that which helps the jury Atailor
the sentence to the particular offense@
and Atailor the
sentence to the particular defendant.@ 
Rogers, 991 S.W.2d at 265.  Consequently, when considering the relevancy
of punishment evidence, we do not ask if it makes a fact in issue more or less
probable but whether it is admissible pursuant to Tex. Code Crim. Proc. Ann. art. 37.07 (Vernon Supp. 2007).  Najar
v. State, 74 S.W.3d 82, 87 (Tex. App.CWaco
2002, no pet.).

Texas
courts have held that punishment evidence can include photographs that
conceptualize the defendant=s
criminal conduct.  In Aragon v. State, 229 S.W.3d 716 (Tex. App.CSan Antonio 2007, no pet.),
the court considered the admissibility of an autopsy photograph of a
four-year-old girl.  The defendant had been previously convicted of
manslaughter in her death, and the State was using this conviction for
enhancement.  The court noted that nothing was depicted in the photograph that
had not been previously testified to and concluded that, although the picture
may have been disturbing, it illustrated nothing more than the reality of the
crime committed.  Id. at 724.








This
case presents a similar situation.  During oral argument, the State contended
that the jury was entitled to know Athat
Burleson was a human being and not just some chewed-up bones.@ Because Burleson=s body was hidden and
allowed to decompose, some of the trial testimony was dehumanizing.  The jury
heard considerable testimony that Burleson=s
body had skeletonized, that his bones had been scattered by animals, that they
showed signs of animal scavenging, and that when found they were treated as
evidence by being boxed up and shipped off for forensic examination.  Prior to
seeing the cruise picture, the jury=s
only visual depictions of Burleson were police and medical examiner photographs
of his bones.

The
jury knew that the cruise picture did not accurately portray Burleson at the
time of his death.  Both his ex-wife and son confirmed that Burleson=s drug use had taken a toll
on his health and his appearance.  However, the photograph was still relevant
as punishment evidence because it reminded the jury that, despite his problems
and issues, Burleson was still a human being and that Thomas had taken a life. 
Furthermore, because of the disclosures accompanying the photograph, its
probative value was not outweighed by the danger of unfair prejudice. We
overrule issue one.

B. 
Factual Sufficiency of the Evidence.

Thomas
next argues that the evidence is factually insufficient to support the jury=s determination that she
murdered Burleson.

1.  Standard of Review.

To
determine if the evidence is factually sufficient, we review all of the
evidence in a neutral light.  Watson v. State, 204 S.W.3d 404, 414 (Tex.
Crim. App. 2006).  Then, we determine whether the evidence supporting the
verdict is so weak that the verdict is clearly wrong and manifestly unjust or
whether the verdict is against the great weight and preponderance of the
conflicting evidence.  Johnson v. State, 23 S.W.3d 1, 10-11 (Tex. Crim.
App. 2000).

2.  The Evidence.








Burleson=s remains were sent to the
Tarrant County Medical Examiner=s
office for evaluation.  Dr. Marc Krouse performed the analysis.  He found a
perimortem fracture of the left zygoma.  Dr. Krouse testified that this injury
alone would not cause death and that it only indicated that Burleson suffered a
blunt force injury to his head.  He acknowledged that 95% of the people who
receive a skull fracture survive but pointed out that 50% of the people who
sustain fatal head injuries have no skull fracture.  Dr. Krouse testified that
he could not determine exactly when Burleson received the blow, except that it
occurred around the time of death.  He knew that it did not occur more than a
week before death, but he could not distinguish between an injury occurring one
day before and one occurring one day after death.

Dr.
Krouse was unable to determine the cause of death.  He explained how a blunt
force trauma can tear the small blood vessels in the brain and cause a subdural
hematoma, how the brain begins to swell, and how an individual can subsequently
die of aortic shock of the head.  He testified that being struck with a pipe
wrench could have caused the injury he observed in Burleson and that it could
have been fatal.  He could not, however, determine if Burleson actually suffered
a subdural hematoma because of the body=s
decomposition.

The
police found blood in Burleson=s
van.  They were unable to find any on a pipe wrench belonging to Thomas or on wood
shavings taken from the floor of her house.  DNA testing established that the
blood found in the van was from a male.  The police did not have a sample of
Burleson=s DNA, so
they compared the blood to his mother=s
DNA.  That blood could not be excluded as having come from one of her
biological children.








Harper
implicated Thomas.  He testified that the night before the incident she was
upset and complained that Burleson was threatening her with an incriminating
tape.  When he got to her house that night, Burleson was already dead; Thomas
told him that she had gotten herself into trouble and asked for his help.  A
neutral review of Harper=s
testimony must also consider several serious credibility concerns.  Harper had
an extensive criminal history, and he appeared at trial pursuant to a bench
warrant from TDC.  He had convictions for burglary of a motor vehicle,
possession of marihuana, possession of a prohibited weapon, and possession of
methamphetamine.  He admitted to using methamphetamine on a regular basis. 
When he saw Burleson=s
body at Thomas=s house,
he did not check on Burleson, call the police, or request an ambulance. 
Instead, he helped Thomas dispose of the body and gave her instructions on
cleaning up blood with hydrogen peroxide and using a black light.  He helped
hide Burleson=s van,
fled to Fort Worth twice, and moved Burleson=s
remains to a new hiding place to avoid detection.  There was also evidence that
Harper admitted to his mother, Corinne Harper, that he had killed Burleson. 
Donald Barker, a longtime friend of Corinne, testified about a conversation he
had with her the summer of 2005.  Barker testified that Corinne visited his
home and was distraught and upset.  Corinne told him that Harper admitted to
her that he had killed Burleson by choking him to death.

Barker=s testimony, however, must
be contrasted with Thomas=s
own admissions to the police and family members.  She gave three different
statements to the police.  In her first, she admitted hitting Burleson in the
head twice with a pipe wrench.  The first blow was hard enough to knock him
down, and the second to knock him out.  In her two subsequent statements she
denied hitting Burleson and blamed Harper for his death.  Thomas=s sister-in-law, Sarah
Thomas, testified that she spoke with Thomas on the phone after her arrest. 
Thomas told her, AWell,
I=m in a mess, but I
had -- they kept screwing me over so I had to set an example, I had to set an
example.@  Her father,
Garth Thomas, testified that his daughter claimed that Burleson had attacked
her and said that she hit him in the head with a pipe wrench.  In a subsequent
conversation, she told him that Burleson had a tape of her assault on another
girl; that the assault was part of an initiation into the Mexican Mafia; and
that, in the process of trying to recover the tape, she hit Burleson in the
head.  In later conversations, she blamed Harper for the murder.  Thomas=s mother, Dolores Diane
Thomas, confirmed that Thomas gave them three different versions of the event
and that in the first version she admitted killing a man with a wrench.  Thomas
also told her mother that, if Harper had fed Burleson=s body to the hogs like she told him to, she
would not be in jail because the hogs would have eaten everything including
Burleson=s bones. 
Dolores was a nurse.  In one conversation, Thomas asked her what an autopsy
would show.

3.  Analysis.

The
indictment alleged that Thomas committed an act clearly dangerous to human life
causing Burleson=s
death by striking him with a pipe wrench or other unknown object, by choking
him, and by manner and means unknown.  There was no definitive determination of
Burleson=s cause of
death.  The only explanations for it were that he was killed by a blow to the
head, by choking, or by a combination of the two.  There was no evidence that
Thomas choked Burleson, and no forensic confirmation that he was choked.  But
there was evidence that Burleson was hit in the head with sufficient force that
it fractured a bone, that Thomas hit Burleson in the head twice with a pipe
wrench, and that she admitted to killing Burleson.  Conversely, there was also
evidence that Harper murdered Burleson by choking him to death.








We
cannot order a new trial simply because, based on the quantum of evidence
admitted, we might have voted to acquit; instead, we must be able to say with
an objective basis in the record that the great weight and preponderance of the
evidence contradicts the jury=s
verdict.  Watson, 204 S.W.3d at 417.  That test has not been satisfied
in this case.  The jury is the exclusive judge of the facts, the credibility of
the witnesses, and the weight to be given to their testimony.  Jaggers v.
State, 125 S.W.3d 661, 670 (Tex. App.CHouston
[1st Dist.] 2003, pet. ref=d). 
The jury may believe all, some, or none of any witness=s testimony.  Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986).  The jury could have resolved the
conflicting accounts of the incident against Thomas and determined beyond a
reasonable doubt that she murdered Burleson.  This conclusion is not against
the great weight and preponderance of the evidence.  Thomas=s second issue is
overruled.

C. 
Corroboration of Thomas=s
Pretrial Confession.  

Finally,
Thomas argues that there was insufficient evidence to support her extrajudicial
confession.  A confession is insufficient to support a conviction unless there
is sufficient evidence to establish the corpus delicti or the act of a
crime.  See Williams v. State, 958 S.W.2d 186, 190 (Tex. Crim. App.
1997) (Under the corpus delicti rule, an extrajudicial confession,
standing alone, is not enough to support a conviction; other evidence must
exist showing that a crime has in fact been committed.).  The State may prove
the corpus delicti by showing that some evidence exists outside of the
extrajudicial confession which, considered alone or in connection with the
confession, shows that the crime actually occurred.  Salazar v. State,
86 S.W.3d 640, 645 (Tex. Crim. App. 2002).  The independent evidence does not
have to identify the accused as the culprit.  Id.  All that is required
is that some evidence make the commission of the offense more probable than it
would be without the evidence.  Cardenas v. State, 30 S.W.3d 384, 390
(Tex. Crim. App. 2000).








Thomas
points out that Dr. Krouse was unable to establish the cause of death, that he
could not opine that Burleson was choked, and that the pipe wrench and floor
shavings from her house tested negative for blood.  Each of these contentions
is true, but none are dispositive of the question.  The question is whether
there was evidence that Burleson was murdered.  The answer to this is yes.
Thomas complained that Burleson was threatening her with an incriminating tape
prior to his death.[1]  Harper
testified that Burleson was dead and lying in a small pool of blood when he
arrived at Thomas=s
house and that there was a pipe wrench near Thomas.  Forensic examination
confirmed that Burleson received a skull fracture at or near the time of death,
that this fracture was caused by blunt force trauma, and that a pipe wrench
could have caused Burleson=s
injury.  Finally, Harper and Thomas hid Burleson=s
body and van and cleaned up all traces of blood at her house.

This
is sufficient evidence to make more probable than not that Burleson was
murdered.  Thomas=s
third issue is overruled.

IV. 
Holding.

We
affirm the judgment of the trial court. 

 

 

RICK STRANGE

JUSTICE

 

April 24, 2008

Do not publish. 
See Tex. R. App. P.
47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]Thomas=s third issue
refers to her extrajudicial confession (singular) but does not specify to which
statement she refers or if she is also including her conversations with family
members.  We have analyzed this issue by excluding any inculpatory statement
made by her after the incident.