

**NUMBER 13-10-00234-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**SHIRLEY PERSONS PIGOTT,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                    **Appellee.**

**On appeal from the 329th District Court
of Wharton County, Texas.**

# MEMORANDUM OPINION

**Before Justices Garza, Vela, and Perkes
Memorandum Opinion by Justice Garza**

A jury convicted appellant, Shirley Persons Pigott, of two counts of evading arrest or detention with a vehicle, *see* TEX. PENAL CODE ANN. § 38.04(a), (b)(1)(B) (West Supp. 2010), with a deadly weapon finding on each count. *See id.* § 12.35(c)(1)(West Supp. 2010) (enhancing state-jail-felony offense to third-degree felony if deadly weapon was

used or exhibited during offense or in flight following offense); *id.* § 1.07(a)(17) (defining deadly weapon). Appellant was acquitted of aggravated assault on a public servant. *See id.* § 22.02(a)(2), (b)(2)(B) (West Supp. 2010). The trial court sentenced appellant to two years' imprisonment on each count, with the sentences to run concurrently. *See id.* § 12.34(a) (West Supp. 2010) (providing punishment range for third-degree felony is two to ten years' imprisonment). By nine issues, which we reorganize as five, appellant contends: (1) the evidence is insufficient to support the jury's deadly weapon findings, and those findings were inconsistent and/or ambiguous; (2) she was denied a fair trial and was denied due process due to (a) prosecutorial vindictiveness, (b) improper cross-examination, and (c) improper jury argument; (3) the trial court failed to reasonably accommodate her disabilities; (4) the trial court permitted improper cross-examination; and (5) the trial court erred in denying her "motion for mistrial and for new trial." We affirm.

## I. BACKGROUND[1]

On September 29, 2007, State Trooper Alfred Ochoa stopped appellant for speeding on Highway 59 in Wharton County, Texas. Appellant refused to roll down her window, but told Trooper Ochoa that she was afraid and wanted another officer at the scene. When Trooper Ochoa refused to summon another officer, appellant slowly drove away, with Trooper Ochoa slowly in pursuit. Trooper Ochoa requested assistance, and Sergeant Daniel Terronez joined the pursuit. Traveling in the left-hand lane, Sergeant Terronez pulled even with appellant's vehicle as Trooper Ochoa followed appellant; appellant pulled over to the right shoulder. However, appellant continued to

---

[1] As this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

refuse to roll down her window, and after the officers attempted to break a rear window, appellant drove away a second time. Appellant was initially speeding, reaching over 100 miles per hour, but then decreased her speed. She eventually pulled over, stopped, and was arrested.

## II. DEADLY WEAPON FINDINGS

### A. Standard of Review

By her first issue, appellant contends the evidence is legally and factually insufficient to support the jury's findings that she used her car as a deadly weapon.

The court of criminal appeals has recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. 2010) (plurality op.). Accordingly, we review claims of evidentiary sufficiency under "a rigorous and proper application of the *Jackson* standard of review." *Id.* at 906-07, 912.

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898-99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt").

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

**B. Law on Deadly Weapon**

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2010). To determine whether the evidence supports a deadly weapon finding in cases involving motor vehicles, we conduct a two-part analysis. *Foley v. State*, 327 S.W.3d 907, 916 (Tex. App.–Corpus Christi 2010, no pet.); *Hilburn v. State*, 312 S.W.3d 169, 177 (Tex. App.–Fort Worth 2010, no pet.) (citing *Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009)). We first "evaluate the manner in which the defendant used the motor vehicle during the felony." *Sierra*, 280 S.W.3d at 255. We then "consider whether, during the felony, the motor vehicle was capable of causing death or serious bodily injury." *Id.*

As to the first part of the *Sierra* test—the manner in which the defendant operated the vehicle—we evaluate whether the defendant's driving was reckless or dangerous. *Id.* We consider several factors in examining whether a defendant's driving was reckless or dangerous: (1) intoxication; (2) speeding; (3) disregarding traffic signs and signals; (4) driving erratically; and (5) failure to control the vehicle. *Id.* at 255-56.

As to the second part of the *Sierra* test, to sustain a finding that the motor vehicle could cause death or serious bodily injury, there must be evidence that others were *actually* endangered. *Foley*, 327 S.W.3d at 916 (citing *Cates v. State*, 102 S.W.3d 735,

4

738 (Tex. Crim. App. 2003); *Drichas v. State*, 219 S.W.3d 471, 476 (Tex. App.–Texarkana 2007, pet. ref'd); *Williams v. State*, 946 S.W.2d 432, 435 (Tex. App.–Fort Worth 1997, pet. dism'd)). A hypothetical potential for danger is not sufficient. *Id.* Therefore, we must "examine the record for evidence that there were other motorists present at the 'same time and place' as the reckless driving occurred." *Id.* at 916 (citing *Drichas*, 219 S.W.3d at 476).

## C. Discussion

Because appellant challenges the sufficiency of the evidence supporting the jury's deadly weapon findings, we set forth the witnesses' testimony relevant to that issue below. The State presented two witnesses: Trooper Ochoa and then-Sergeant Daniel Terronez.

### 1. Trooper Alfred Ochoa

Trooper Ochoa testified that during the evening hours of September 29, 2007, he observed appellant's vehicle speeding northbound in the lefthand lane on Highway 59. When his vehicle was behind appellant's, Trooper Ochoa turned on his overhead lights. Instead of pulling over to the right shoulder, appellant pulled over to the left side of the roadway, onto the grassy median, and stopped. Trooper Ochoa pulled over to the right shoulder of the highway and used his bullhorn to instruct appellant to move to the righthand side of the roadway when it was safe to do so. When appellant did not move her vehicle, Trooper Ochoa crossed the highway and pulled his vehicle behind appellant's. Trooper Ochoa approached appellant's vehicle and asked her to roll down her window. Appellant refused to do so. Trooper Ochoa was concerned for his safety

5

because he could see appellant "shuffling" and "messing around" inside the vehicle. Appellant began honking her horn and slowly drove away from Trooper Ochoa.

Trooper Ochoa called Sergeant Terronez for assistance. With Sergeant Terronez's assistance, appellant pulled over again, this time on the right shoulder of the highway. However, appellant still refused to roll down her window or exit the vehicle. With Trooper Ochoa standing in front of appellant's vehicle, attempting to block appellant's exit, appellant nonetheless drove forward, forcing Trooper Ochoa to move out of the way as appellant re-entered the highway. Trooper Ochoa shouted that appellant should not pull out because an 18-wheeler was rapidly approaching. Appellant ignored the warning and re-entered the highway. Trooper Ochoa feared that appellant's flight from the officers would likely result in an accident.

Appellant raced down the highway, quickly reaching a speed in excess of 100 miles per hour. After almost losing control of the vehicle, appellant decreased her speed. Eventually, she pulled over and was arrested. By this time, six officers were involved in the pursuit.

On cross-examination, Trooper Ochoa stated that he did not recall that appellant displayed her driver's license through the window and did not recall that she asked him for identification. Trooper Ochoa admitted that his report did not state that appellant hit him with her vehicle when fleeing from the second stop. Trooper Ochoa stated that appellant violated the law by pulling over to the left, rather than to the right, during the first stop.[2] Trooper Ochoa stated that during the second stop, he told appellant not to pull out in front of the 18-wheeler, but she pulled out anyway.

---

[2] *See* TEX. TRANSP. CODE ANN. § 545.156 (West 1999) ("On the immediate approach of an authorized emergency vehicle using audible and visual signals . . . an operator . . . shall . . . yield the

6

### 2. Lieutenant Daniel Terronez[3]

Officer Terronez testified that, in response to Trooper Ochoa's request, he encountered Trooper Ochoa following appellant's vehicle, at a speed of only ten to fifteen miles per hour. Officer Terronez pulled up beside appellant's vehicle, and she gestured for him to pull over. Appellant and Officer Terronez pulled over to the right shoulder; Officer Terronez parked in front of appellant's vehicle. Officer Terronez said he did not force appellant's vehicle off the road. Officer Terronez believed that when appellant initially motioned to him, she did not realize he was an officer; however, when he exited his vehicle and she saw his uniform, she began honking her horn. Although Officer Terronez asked appellant to roll down the window, get out of her vehicle, and provide her driver's license, she did not do so. Officer Terronez did not recall appellant showing her driver's license at all. Because appellant refused to cooperate, Officer Terronez backed his car up to block appellant from leaving the scene. He decided to break a window on appellant's vehicle so she could eventually be forcibly removed if necessary. He noted that by this time, appellant had already committed a felony by fleeing from Trooper Ochoa.

Appellant continued to honk the horn and inch forward, maneuvering between the officers' vehicles; she eventually forced Trooper Ochoa out of the way and fled a second time. Officer Terronez testified that as appellant pulled onto the highway, the incident could have seriously injured Trooper Ochoa. During the second pursuit, Officer Terronez estimated appellant's top speed at 107 or 108 miles per hour. He stated that

right-of-way [and] immediately drive to a position parallel to and as close as possible to the right-hand edge or curb of the roadway . . . .").

[3] At the time of the events at issue, Officer Terronez was a Sergeant with Department of Public Safety, but had been promoted by the time of trial.

such speeds presented a risk of bodily injury or death to others because appellant could have lost control of her vehicle. Officer Terronez contacted the Wharton police department and several other troopers and requested their assistance. Several officers deployed "Stinger spikes" across the highway. Unfortunately, the spikes accidentally disabled a vehicle in front of appellant's. However, when appellant saw the officers on the side of the road, she pulled over.

The defense presented two witnesses: Dr. Matthew Brams, appellant's treating psychiatrist, and appellant.

### 3. Dr. Matthew Brams

Dr. Brams testified that he has been treating appellant for three or four years. Defense counsel questioned Dr. Brams about his report, in which he answered questions based on certain assumed facts. Dr. Brams stated his opinion that a sixty-year-old woman such as appellant, stopped by an officer at night, could reasonably have believed that if she opened the door to her vehicle before moving to a public place, she might be harmed. Appellant was diagnosed with bipolar disorder and attention deficit hyperactivity disorder ("ADHD"), and was taking medication for those conditions. Dr. Brams explained that because of several recent stressful situations, he had also diagnosed appellant as suffering from post-traumatic stress disorder ("PTSD"). Dr. Brams stated that a person with PSTD is "over-sensitive" and perceives fear even in the absence of any reason to be fearful. In stressful situations, a person with PTSD feels an urgent "need to flee the perceived danger." According to Dr. Brams, if appellant had been given a reasonable period of time without intimidation or threats during the first stop, she could have regained her composure.

On cross-examination, Dr. Brams stated that in his expert opinion, appellant's behavior on the night of her arrest was directly related to her mental condition. When asked about the causes of appellant's stress, Dr. Brams mentioned (1) appellant's fight with the Texas Medical Board and the possible loss of her medical license and (2) her late husband had exhibited signs of early Alzheimer's disease.[4]

## 4. Appellant

Appellant testified that she was traveling in the left lane when she first noticed the officer's vehicle behind her with its siren and emergency lights activated. Because there was another vehicle in the righthand lane, appellant moved off the road to the left to let the officer pass by. Trooper Ochoa stopped on the right shoulder some distance behind appellant and used his bullhorn to instruct appellant to move to the right side of the road when it was safe to do so. Appellant testified that it was not safe because there was heavy traffic. According to appellant, cars were passing by at the rate of twelve per minute, or one every five seconds. Finally, Trooper Ochoa "zipped over" and parked behind appellant's vehicle.

Because she was confused and fearful, appellant locked her doors. Appellant stated that she held her driver's license up to the window, but Trooper Ochoa only glanced at it. Appellant testified that she was shaken up when Trooper Ochoa asked if she wanted to go to jail that night. Appellant did not crack her window because she feared that the electric window switch would open the window completely. Appellant asked to see Trooper Ochoa's identification, but he refused. She also asked if he would summon another officer, but he refused. She asked permission to go to the next lighted

---

[4] Appellant's husband was alive the night appellant was arrested, but by the time of trial, had committed suicide.

area, but Trooper Ochoa said "no." Appellant asked Trooper Ochoa to follow her to the next lighted area; she then slowly drove away on the grassy median with her hazard lights flashing. When she reached a speed of forty miles per hour, appellant pulled back onto the highway. She moved to the right-hand lane, traveling with the flow of traffic, but below the speed limit. Appellant believed Trooper Ochoa was following her to the next lighted area.

Appellant noticed that an unmarked vehicle, traveling in the lefthand lane, had pulled up next to her vehicle. She felt the vehicle was "too close." She realized that the driver of the second car was also an officer. Appellant felt the second officer was also "doing things to aggravate [her]" instead of trying to calm her down. Appellant stated that what bothered her the most was that the second officer "stayed even" with her. She pulled over because he was would not pass by and "tried to crowd [her]." Appellant stated that she became "more and more anxious" because she felt the officers "should be doing things to calm [her] down."

After appellant pulled over the second time, she held her driver's license up to the window, but the officers did not pay much attention. Officer Terronez told appellant that if she did not open the window, he would break it in. She responded that if he did so, she would leave. Appellant also began honking her horn to "get somebody's attention." Appellant began moving her vehicle forward and heard Officer Terronez smashing her window. As she edged forward, appellant heard Trooper Ochoa shouting, but it did not register that he was shouting a warning about the traffic. With regard to re-entering the highway, appellant testified that, "barreling down at me was an 18-wheeler. And that scared the living daylights out of me. He turned and I turned, and he came

10

within a few feet of killing me." After that, appellant "floored it"; when she smelled burning rubber, she noticed she was going 107 miles per hour. Appellant slowed down and began looking for a lighted place to stop. She saw a place on the left, but decided it was not open, and continued driving. Eventually, appellant saw several law-enforcement vehicles with flashing lights, felt it was safe to stop, and pulled over.

On cross-examination, appellant testified that when she fled the second time, "an 18-wheeler almost collided with [her] in [her] lane."

### 5. Deadly Weapon Finding on Count Two

Count one charged that, using a vehicle as a deadly weapon, appellant intentionally fled *from Alfred Ochoa*. Count two charged that, using a vehicle as a deadly weapon, appellant intentionally fled *from Daniel Terronez*. Although there is some question as to the scope of events included in count one—discussed more fully below—Officer Terronez was not present when appellant fled after the first stop. Thus, we assume that count two is limited to appellant's conduct when she fled from the second stop.

Appellant contends that with respect to her actions following the second stop, even though she "panicked" and "drove over the speed limit for 93 seconds," "[t]here is no evidence of actual danger to a person; no evidence that a person was put at risk of harm from [her] use of her car." We disagree.

The video of the incident, which was played for the jury at trial, shows that because Officer Terronez's vehicle was parked in front of appellant, appellant was unable to use the right shoulder to accelerate before entering the right-hand lane of the highway. She therefore maneuvered into the lane, attempting to merge with heavy

11

traffic, from a dead stop. Appellant's own testimony established that when she entered the highway, an 18-wheeler "came within a few feet" of killing her. The 18-wheeler can be seen and heard whizzing by in the video.

The entire sequence of events—from the time the video is activated by Trooper Ochoa's emergency lights to appellant's third and final stop when she was arrested—took place between 8:17 and 8:35 in the evening on Highway 59, a major highway. Again, appellant's own testimony established that the traffic was heavy and that vehicles were passing by at the rate of one every five seconds.

After entering the highway, Officer Terronez estimated appellant's speed at 107 or 108 miles per hour. Appellant admitted speeding at 107 miles per hour and only slowed down after she "smelled rubber." Officer Terronez testified that such speeds presented a risk of bodily injury or death to others because appellant could have lost control of her vehicle.

Viewing the evidence in a light most favorable to the prosecution, we conclude that a rational jury could have determined beyond a reasonable doubt that appellant used or intended to use her vehicle in a manner capable of causing death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 1.07(a)(17); *Sierra*, 280 S.W.3d at 256 (holding evidence of deadly weapon legally sufficient when defendant exceeded speed limit, failed to maintain control of his SUV, and in fact caused serious bodily injury to another). We conclude appellant's driving was reckless or dangerous, *see Sierra*, 280 S.W.3d at 255-56, and that there is evidence that others were *actually* endangered in the accident. *See Foley*, 327 S.W.3d at 916. We hold the evidence was legally sufficient to support the jury's deadly weapon finding as to count two.

12

### 6. Deadly Weapon Finding on Count One

Appellant also challenges the sufficiency of the evidence supporting the jury's finding that she used her vehicle as a deadly weapon as to count one, when she fled from Trooper Ochoa. We need not address this issue, however, because even assuming, as appellant claims, that the evidence is insufficient to support a deadly weapon finding as to count one, appellant cannot show she was harmed.

Appellant does not challenge the sufficiency of the evidence supporting her conviction for two counts of evading arrest or detention with a vehicle—only the sufficiency of the evidence supporting the jury's deadly weapon finding. Even if we assume that the evidence is insufficient to support the deadly weapon finding as to count one, the consequence is that appellant's conviction on count one would be reduced to a state-jail-felony offense instead of a third-degree felony. *See* TEX. PENAL CODE ANN. §§ 38.04(a), (b)(1)(B); 12.35(c)(1). The trial court imposed the minimum punishment for a third-degree felony—two years' imprisonment—on each count, with the sentences to run concurrently. The penalty range for a state jail felony *without* the use of a deadly weapon is 180 days to two years' confinement in a state jail, and an optional maximum $10,000 fine. *See id.* § 12.35(a), (b). We have already affirmed appellant's conviction as to count two by determining that the evidence is sufficient to support the jury's deadly weapon finding as to that count. Therefore, appellant must serve the minimum two-year punishment imposed for count two. Even if we were to eliminate the deadly weapon finding as to count one, and appellant's sentence as to count one was reduced, any punishment within the punishment range for the resulting

state jail felony is within her two-year sentence for count two. Accordingly, the error, if any, is harmless.

### 7. Ambiguity of Verdict

As a sub-issue, appellant contends that there is "uncertainty" as to the jury's verdict because both the State and the defense presented argument that the deadly-weapon issue as to count one involved the use of the vehicle following the first stop, and the deadly-weapon issue as to count two involved the use of the vehicle following the second stop. Appellant filed a post-conviction motion for new trial in which she argued, among other things, that the jury's deadly weapon finding on count one was "ambiguous and uncertain" and fatally inconsistent if the jury intended the deadly weapon finding on count one to be limited only to appellant's conduct in fleeing from the first stop. At the hearing on the motion, appellant's counsel made the same argument:

> You can't have—it wouldn't make sense for there to be two fleeing questions just because there were two officers at the second stop. There were two fleeing issues. One from the first stop and then a deadly weapon issue. That's the way it was set up. That's the way it was argued.

> Then there was a second stop, and there was a question whether she fled from the second stop. And so the deadly weapon, the jury answered under Count No. 1 that she used a deadly weapon talking about from the first flee.

The trial court stated that it was unnecessary for it to rule on appellant's argument that the first stop did not involve the use of a deadly weapon as a matter of law because the court did not agree "that Count 1 only deals with the first stop and Count 2 deals only with the second stop." The court stated, "I don't believe that Count 1 was limited to the first stop. I don't believe either count is specified as whether it was the first stop or the second stop."

14

Appellant's "inconsistency" argument is essentially the same as her sufficiency challenge to the deadly weapon finding as to count one. We need not address it for the same reason stated above: even if the jury limited its consideration of the deadly weapon finding in count one to the events surrounding the first stop—and erroneously found the evidence sufficient to support the deadly weapon finding—appellant cannot show she was harmed. The trial court came to the same conclusion, stating:

> Even if I agreed with you and determined that Count 1 regarded solely the first stop and Count 2 regarded solely the second stop; and assume further that I were to rule that the first stop, there was not sufficient evidence of the use of a car in a manner that would qualify as a deadly weapon.
>
> Even if all of that happened, your client [appellant] would still have been properly found guilty under Count 2 of all of the elements necessary to support the verdict in this case.
>
> And also it would mean that, again, I'm stuck with the minimum sentence; and your client is not probation eligible.

We agree with the trial court. We overrule appellant's first issue.

### III. DENIAL OF FAIR TRIAL AND DUE PROCESS

By her second issue, appellant contends she was denied "fundamental fairness" at her trial due to prosecutorial misconduct or vindictiveness, improper cross-examination, and improper jury argument. We address these sub-issues in turn.

### A. Prosecutorial Vindictiveness

Appellant contends she was denied "fundamental fairness" and due process because the district attorney prosecuted her on the aggravated assault charge in retaliation for allegations she made claiming the DPS officers involved in her arrest were engaged in illegal conduct. Appellant made the allegations against the officers in pro se motions she filed in her criminal case.

15

Appellant has presented no "clear and concise argument" in support of this contention. Accordingly, this sub-issue is inadequately briefed, and appellant has presented nothing for review. *See* TEX. R. APP. P. 38.1(i); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008).

Moreover, even if appellant had preserved the issue, we find appellant's complaint to be without merit. A presumption of prosecutorial vindictiveness applies only in limited circumstances, and is not applicable here. *See Neal v. State*, 150 S.W.3d 169, 173-75 (Tex. Crim. App. 2004). When, as here, the presumption does not apply,

> the defendant may still obtain relief if he can show actual vindictiveness. To establish that claim, a defendant must prove, with objective evidence, that the prosecutor's charging decision was a "direct and unjustifiable penalty" that resulted "solely from the defendant's exercise of a protected legal right." Under this prong, the defendant shoulders the burden of both production and persuasion, unaided by any legal presumption. Once again, the trial judge decides the ultimate factual issue based upon the evidence and credibility determinations.

*Id.* at 174-75 (citations omitted). Appellant briefly raised the issue of prosecutorial vindictiveness in an oral motion for mistrial at the close of evidence. Appellant's counsel argued that the prosecutor deliberately asked appellant questions that were "unclear," and as a result, appellant "seiz[ed] up." At a hearing on appellant's post-conviction motion for new trial, appellant's counsel testified that prior to trial, he met with the prosecutor, at which time the prosecutor refused to dismiss the case and stated that he was going forward with the case to vindicate the officers that appellant had insulted. We conclude that even if the trial court accepted appellant's counsel's testimony as true, it does not establish that the prosecutor's decision to charge appellant was a "direct and unjustifiable penalty" that resulted solely from appellant's exercise of a

16

protected legal right.  *See id.*  We hold appellant did not establish a claim of prosecutorial vindictiveness.

## B. Improper Cross-Examination

Appellant contends that the district attorney's cross-examination of her was improper because it "was crafted for the purpose[s] of taking advantage of [appellant's] disability" and to "create stress so that [a]ppellant would appear arrogant and uncooperative."  Again, although appellant has provided some record citations in the "Statement of Facts" section of her brief—but no authorities—she provided no record citations at all and virtually no "appropriate citation to authorities" in the "Argument and Authorities" section of her brief.  *See* TEX. R. APP. P. 38.1(i).  Nonetheless, in the interest of justice, we review the issue.

Appellant complains that the prosecutor ignored her "requests for 'reasonable accommodations' that would have allowed her to testify without being dismantled during cross-examination."  In her brief, appellant asserts that because of her disability, she "is unable to process information in a stressful situation."  She asserts that "[t]o overcome this problem, Appellant's attorney attempted to structure and limit the areas on which Appellant would testify."  The brief states:

> Appellant submitted a two[-]page written Summary Statement of Appellant's testimony concerning the event on the highway.  Appellant proposed, to the district attorney and the trial court, that the summary be admitted into evidence; that both sides be limited to questions about the subject areas in the summary.  Appellant argued that her disability would prevent her from functioning unless she knew ahead of time the issues on which she must give testimony.  The district attorney refused to agree to the request.

17

The record simply does not support appellant's version of the facts. After the State rested, and outside the presence of the jury, appellant's counsel advised the court of his plans to present the testimony of Dr. Brams and appellant:

| | |
|---|---|
| [Appellant's counsel]: | And then, Dr. Pigott, I anticipate the same thing, subject to [the prosecutor's] agreement or not. I have—I think I gave you a copy—kind of a summary of her testimony which I want to ask if this is all her testimony—let her have it to use as she testifies because that will help keep her calm and structured. And then [the prosecutor] can also use it to cross-examine her. |
| | And so with those two documents I can zip in and out of this. Of course, [the prosecutor] is not going to be restricted to those documents. |
| [The Court]: | I understand. Do you anticipate we'll be finishing today? |
| [Appellant's Counsel]: | I think we'll be finished with our testimony this morning. |

During his direct examination of appellant, appellant's counsel offered the "summary" into evidence. The trial court ruled that appellant could use the summary during her testimony to refresh her recollection, but refused to admit it as evidence.[5] At no time did appellant's counsel request that the prosecutor's cross-examination be restricted to the subjects in the summary.

Specifically, appellant complains that: (1) the prosecutor asked her questions about speeding, even though it was undisputed that she was speeding; (2) the prosecutor called attention to her posture and demeanor by asking her to lean forward; (3) the prosecutor asked her to explain how her disability was affecting her testimony;

---

[5] We note that despite the trial court's ruling, the summary is included in the record as Defense Exhibit 7.

18

(4) the prosecutor led her to say she believed he might trick her; and (5) the prosecutor asked questions about her claims of conspiracy between the DPS and the Texas Medical Board, her conflicts with the Texas Medical Board, and other topics that were prohibited by the State's motion in limine. Appellant provides no authority supporting her argument that the prosecutor's questions were improper.

The record shows that on numerous occasions, appellant asked the prosecutor to repeat his question so she would "know exactly" what she was answering. Appellant also stated that she was "hyper-vigilant" because she was concerned that the prosecutor was trying to trick her. Several times, appellant said she was "not going to keep answering the same question"; her counsel interrupted on several occasions to encourage her to "be more willing to answer [the prosecutor's] questions." Although appellant complains of being questioned about her conflicts with the Texas Medical Board,[6] her own counsel questioned her about those issues on direct examination.[7]

Appellant may have appeared uncooperative and argumentative,[8] and she may not have been an effective or sympathetic witness. However, we see no evidence that she was so confused that she was unable to testify and no evidence that the prosecutor "leveraged" or took advantage of any alleged disability. We conclude that appellant did not establish that she was denied due process because of improper cross-examination.

---

[6] In a pre-trial discussion with the trial court, the prosecutor stated that if appellant testified, he would question her about statements she made during the course of the Texas Medical Board hearing, without identifying it as a hearing before the Texas Medical Board. Appellant's counsel said, "That's fine."

[7] *See Torres v. Danny's Serv. Co.*, 266 S.W.3d 485, 487 (Tex. App.–Eastland 2008, pet. denied) ("Texas follows a policy of wide-open cross-examination. . . . Thus, a witness may be cross-examined on any issue that is probative of her credibility. This includes evidence that reflects any impairment or disability affecting the witness's credibility.") (citations omitted).

[8] At one point, during cross-examination, she instructed the prosecutor, "I'm sorry I have to teach you the law."

19

Because appellant repeated the same arguments in her fourth issue, we also overrule her fourth issue.

In her third issue, appellant makes the same arguments regarding improper cross-examination, but characterizes the issue as a denial of "reasonable accommodations" that "would have allowed her to testify without being dismantled during cross-examination." Because we have concluded that those arguments are without merit, we also overrule appellant's third issue.

## C. Improper Jury Argument

In the third sub-issue of her second issue, appellant complains that she was denied due process when the prosecutor engaged in improper jury argument. Specifically, appellant complains of the following argument:

> [Prosecutor]: I have a job under the law to see that justice is done. Not to be hell-bent on convictions.
>
> Now I will concede in this case, based on what this defendant did and what she put those officers through, yeah, I'm hell-bent on a conviction in this case. But I'm going to do it the right way.
>
> . . . .
>
> I have no idea why the defendant did what she did. Was she under some sort of mental influence? I don't think we've seen any real credible evidence of that.
>
> Was she ticked off? This cop had the nerve to stop her and demand that she present her driver's license, a lowly police office daring to confront a medical doctor? You've seen her attitude. She's arrogant with me. What do you think she treated him like?

Appellant contends that the prosecutor's argument that "[a]ppellant is arrogant and uncooperative because she is a medical doctor" is outside the record and is

20

"inflammatory." The State responds that: (1) appellant waived her complaint because she did not object at trial to the prosecutor's jury argument; and (2) the prosecutor's statement attributing appellant's arrogance to her status as a medical doctor was a reasonable deduction from the evidence.

"[A] defendant's failure to object to a jury argument or to pursue to an adverse ruling his objection to a jury argument forfeits the right to complain about the argument on appeal." *Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004); *see Adams v. State*, No. 13-09-334-CR, 2010 Tex. App. LEXIS 5588, at *41 (Tex. App.– Corpus Christi July 15, 2010, pet. ref'd) (mem. op., not designated for publication). Here, appellant did not object to the jury argument and has forfeited her right to complain about it on appeal. *Threadgill*, 146 S.W.3d at 670. Having overruled each sub-issue, we overrule appellant's second issue.

## IV. DENIAL OF MOTION FOR MISTRIAL

In her fifth issue, appellant contends that the trial court erred in denying her "motion for mistrial and for new trial." Appellant listed this issue in the "Errors Presented" section of her brief, and it appears in the "Summary of Argument" section as follows: "The trial court erroneously denied Appellant's motion for mistrial, which alleged the series of improper acts by the D.A." However, the issue is not addressed at all in the "Argument and Authorities" section of the brief. Accordingly, appellant has presented nothing for review. *See* TEX. R. APP. P. 38.1(i); *Busby*, 253 S.W.3d at 673.

As noted above, appellant's counsel made an oral motion for mistrial at the close of the evidence, arguing that the prosecutor had intentionally asked appellant unclear questions, and had "used . . . [appellant's] mental disabilities . . . to defeat [her]

21

opportunity to project herself fairly to the jury." We have rejected appellant's arguments that the prosecutor acted improperly. We overrule appellant's fifth issue.

## V. CONCLUSION

We affirm the trial court's judgment.

_____
DORI CONTRERAS GARZA
Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
2nd day of June, 2011.